## COMMONWEALTH vs. KENNETH N. PADGETT.

No. 96-P-1900.

Worcester. November 13, 1997. - March 3, 1998.

Present: WARNER, C.J., DREBEN, & FLANNERY, JJ.

*Joint Enterprise. Evidence,* Joint enterprise, Photograph. *Intent. Robbery. Felony-Murder Rule. Homicide. Practice, Criminal,* Instructions to jury, Argument by prosecutor, Assistance of counsel, Sentence. *Accessory and Principal.*

Evidence at the trial of indictments for armed robbery and assault with a dangerous weapon was sufficient to warrant the jury to find the defendant guilty as a joint venturer. [362-363]

Evidence at the trial of an indictment for armed robbery was sufficient to warrant the inference that the defendant intended permanently to deprive the owner of the property taken. [363-364]

A homicide committed in the course of a defendant's flight from an armed robbery was a probable consequence of the felony and warranted the defendant's conviction of murder by reason of felony-murder. [364-366]

At the trial of a murder indictment on a theory of felony-murder, no substantial likelihood of a miscarriage of justice was created by the judge's instructions to the jury on accessory [366-367]; on the defendant's knowledge that his codefendant had a gun and that there was a substantial likelihood that he would commit a murder [367]; and on the felonies forming the basis of felony-murder [367-368].

At a a murder trial, the judge properly within his discretion admitted autopsy photographs in evidence. [368]

At a criminal trial, error, if any, in the prosecutor's argument to the jury regarding the defendant's credibility created no substantial likelihood of a miscarriage of justice. [368-369]

A criminal defendant did not demonstrate that his trial counsel had rendered ineffective assistance. [369-370]

At a criminal trial, the judge correctly imposed separate sentences for the defendant's convictions of two breaking and entering charges and two larceny charges, where none of the offenses "merged." [370]

In a case in which a defendant was convicted of second degree murder on the basis of felony-murder, his conviction and sentence on the underlying felony, armed robbery, were duplicative. [370-371]

INDICTMENTS found and returned in the Superior Court Department on March 22, 1994.

The cases were tried before *Herbert F. Travers, Jr.,* J.

*Emanuel Howard* for the defendant.

*James P. McKenna,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. What began on the morning of February 1, 1994, as a series of house breaks rapidly escalated into far more serious crimes and culminated in the death of the police chief of Paxton. Charged as a joint venturer with two other men, Michael Souza and James Richards, the defendant was convicted of second degree murder, based on a theory of felony-murder, and of ten other offenses.[1] Although the defendant claims sixteen errors on appeal, his primary contentions are (1) there was insufficient evidence to find him a joint venturer in the gun-related charges; (2) the homicide was not the natural and probable consequence of the underlying felonies; (3) the judge should not have included the daytime house breaking or armed assault charges as felony-murder predicates; (4) the judge's instructions were erroneous in numerous respects; and (5) the sentences imposed were illegal. We affirm the convictions with the exception of the one for armed robbery, which merged in the second degree murder conviction.

1. *The evidence and its sufficiency to convict the defendant of armed robbery and armed assault.* Taking the evidence — much of which came from the defendant's statements to the police after his arrest — in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), the jury were warranted in finding the following facts. Needing money to pay his rent, the defendant agreed with his friends Souza and Richards to commit a series of house breaks. Souza had committed such breaks in the past with the defendant and had also engaged in such breaks with Richards. The defendant knew that Souza had three guns. He also had heard Souza state on more than one occasion, and as recently as two months before February 1, 1994, that "some day he'll have to kill a police officer to get away because he would not go back to jail."

On the morning of February 1, before they set off on their

---

[1]The other convictions were of armed robbery, assault with a dangerous weapon (three), breaking and entering in the daytime with intent to commit a felony (two), breaking and entering a building with intent to commit a misdemeanor, use of a motor vehicle without authority, and larceny over $250 (two).

venture, Souza told the defendant that Richards had his choice of "which piece [gun] he wanted, the .357 or the .22." Thereafter, driven by Souza in a stolen van, the three men broke into a home on Kendall Road in Holden and removed various items. During the break-in, Souza told the defendant that he had a gun, adding, " 'If anybody comes home, I'm going to take him down.' Not as in kill them, but tie them up and make sure we can get away." They broke into a second house on Kendall Road and, after stealing some property, left quickly as Richards had spotted a car driving slowly past.[2]

Kendall Road leads into a restricted reservoir area, and, in error, Souza drove in. Shortly before 11 A.M., a Department of Public Works foreman, Richard Polli, seeing the van, and afraid that it would hit another crew working ahead on the narrow, icy road, jumped into his truck and headed toward the other crew. Before Polli could reach the men who were working ahead, the van turned around, and the two vehicles collided, the van ending up in a snowbank. Souza cursed Polli, and after he, Richards, and the defendant tried unsuccessfully to extricate the van, Souza asked Polli for assistance. When Polli refused, Souza pulled out a nine millimeter handgun, waved it at Polli and his three crew men, and ordered them to the ground. He fired a shot in the air and pointed the gun at Polli, whereupon Polli told him to "take the truck and screw."

With Richards and the defendant as passengers, Souza backed down the road and, within 200 feet, the truck became stuck in the snow. The three men fled and ran over an ice-covered reservoir into some woods. After running for about fifteen to twenty minutes, they reached Route 31 where they saw a police car coming toward them. They crossed the road and ran into woods on the other side.

By this time the Holden police were alerted to the house breaks and to the shooting in the reservoir area. A Holden police officer investigated the reservoir site and found the stolen van containing items matching the description of the property taken from the Kendall Road homes. The officer radioed Chief Robert

---

[2]Our recitation of the facts is taken entirely from the Commonwealth's case except for the explanation that the men left the second house break quickly because of Richards' observation. The defendant requested required findings of not guilty at the close of the Commonwealth's presentation and again at the close of the defendant's case. The Commonwealth's case did not deteriorate during the defendant's case.

Mortell of the Paxton police with the request that he assist with his dog. Numerous policemen began patrolling the area looking for three men on foot.

After receiving a description of the three men, Chief Mortell radioed his location and indicated that he had sighted the three men. He followed the three into the woods, leaving his car on the road. Shortly after receiving Mortell's radio communication, Officer Ahearn of the Paxton police department arrived at the location described by Mortell and parked behind Mortell's cruiser. Seeing four sets of footprints in the snow leading into the woods, Ahearn followed them in an effort to catch up with Mortell. Within a minute he heard gunshots — about thirteen — and within thirty seconds came upon the chief, leaning against a tree. Emergency medical technicians were summoned at 11:32 A.M., and they took Mortell to a hospital where he was pronounced dead between 11:45 A.M. and noon.

The chief was found about 100 yards into the woods. His footsteps had pointed in a southeasterly direction. Three other sets of footprints pointed in the same direction but separated ten to fifteen feet beyond the location where he was found. One set went east and two sets south.

With the aid of a dog, police following the easterly footsteps discovered Souza's nine millimeter gun — the gun with which the chief had been shot. Other officers arrested Souza about a quarter of a mile away.

Richards and the defendant spent the night hidden in an abandoned building and were arrested the following day. While Richards and the defendant were together, Richards "ditch[ed]" a gun into the snow.

Although the defendant argues that there was insufficient evidence to find him guilty as a joint venturer in the armed robbery of the Department of Public Works truck or the gun assaults on the work crew at the reservoir site, the jury were warranted in finding otherwise. "A defendant can be convicted as a joint participant in a felony, if he or she was '(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary.' " *Commonwealth* v. *Ortiz,* 424 Mass. 853, 856 (1997) (citations omitted). While more than mere acquiescence is needed, "physical participation is not required so long as there is 'association with the criminal venture and any significant participation in it.' " *Ibid.* (citations omitted).

The jury could find that all three requirements were met here. The defendant was at the scene of the armed assaults and the armed robbery. From Souza's statement that Richards would get "first pick of the piece," the jury could infer that the defendant knew that guns were taken to the house breaks. In addition, the defendant was directly told by Souza during the first house break that he (Souza) was armed. The defendant also knew that Souza was willing to shoot a police officer to avoid returning to jail. Indeed, after his arrest, the defendant told the police, "I always knew something like this was going to happen." Thus, knowing that Souza would use all force necessary to escape, and knowing at least by the time of the second house break that Souza was armed, the defendant joined in the venture to break into homes. He remained in the stolen van as the three men drove into the reservoir area, helped in trying to push the van out of the snow, entered the stolen truck — the fruit of the armed robbery — and, even after the three abandoned the truck, remained with the other two as they fled across the reservoir, into the woods, across Route 31, and 100 yards into another wooded area. See *Commonwealth* v. *Williams,* 422 Mass. 111, 121 (1996) (finding of joint venture warranted where evidence showed defendant was present at the scene of the crime and that he and another entered the building together and fled together). See also *Commonwealth* v. *Santos,* 402 Mass. 775, 787 (1988). At no point prior to the separation from Souza (or his footprints) more than 100 yards into the woods did the defendant disassociate himself from Souza. Based on this evidence, the jury were warranted in finding that the defendant had the requisite intent and was willing and available to help Souza if necessary in the armed assaults and armed robbery. The defendant was sufficiently involved to be considered a participant in these crimes.

While the defendant may not have wanted the assaults or the armed robbery to occur, the jury were warranted in finding the requisite mental state by determining that the defendant possessed a "conditional or contingent intent, i.e., a willingness to see some action occur should it become necessary to effectuate the plan" or make good the escape. *Commonwealth* v. *Mangula,* 2 Mass. App. Ct. 785, 789 (1975). See *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973); *Commonwealth* v. *Watson,* 388 Mass. 536, 544-545 n.7 (1983).

The defendant also argues that there was insufficient evidence

to find him guilty of armed robbery because the defendant did not intend to retain the truck, and there was no evidence warranting the inference that he intended permanently to deprive the owner of its use. The contention is without merit. "One who takes property without the authority of the owner and so uses or disposes of it as to show indifference whether the owner recovers possession may be found to intend to deprive the owner of it permanently." *Commonwealth* v. *Salerno*, 356 Mass. 642, 648 (1970). See *Commonwealth* v. *Moore*, 36 Mass. App. Ct. 455, 456-457 (1994). See also *State* v. *Barts*, 316 N.C. 666, 690 (1986) (taking and subsequent abandonment of truck indicated a complete lack of concern as to whether the owner ever recovered it and constituted sufficient evidence of an intent to deprive the owner permanently of his property).

2. *Felony-murder*. The jury found the defendant guilty of second degree murder on the basis of six separate underlying felonies.[3] Since, as we conclude, the evidence warrants the jury's separate finding of felony-murder by reason of the armed robbery, it is unnecessary to consider the validity of the jury's finding of second degree murder on the basis of any other felony. See *Commonwealth* v. *Cruz*, 424 Mass. 207, 209 (1997).[4]

In order to invoke the felony-murder rule, the Commonwealth

---

[3] Armed robbery of Richard Polli; three assaults by means of a dangerous weapon (one on each member of the work crew at the reservoir site); and breaking and entering two homes on Kendall Road.

[4] (a) *House breaks as felony predicates.* The defendant claims that the judge erred in using the daytime house breaking charges as felony-murder predicates, and that this error unfairly infected the jury's consideration of the gun-related charges. Although we do not decide the issue, we note that the judge may have been correct in determining that the daytime (armed) breaks into a dwelling house were inherently dangerous, see *Commonwealth* v. *Claudio*, 418 Mass. 103, 107-109 (1994); *State* v. *Collins*, 297 A.2d 620, 637 (Me. 1972); *People* v. *Miller*, 32 N.Y.2d 157, 160-161 (1973); 2 LaFave, Substantive Criminal Law § 7.5, at 230 (1986); Model Penal Code §§ 210.2(1), 221.1(1) (1980); N.Y. Penal Law §§ 125.25(3), 140.20 (McKinney 1998). In *Commonwealth* v. *Claudio, supra* at 107, the Supreme Judicial Court, referring specifically to § 140.20, the New York statute defining burglary without reference to time of entry and which under New York law is a predicate for felony-murder, noted that, in general, felonies enumerated in the New York Penal Code as predicates for felony-murder "would be classified under the Commonwealth's criminal law as felonies inherently dangerous to human life." See *United States* v. *Patterson*, 882 F.2d 595, 604 (1st Cir. 1989), cert. denied, 493 U.S. 1027 (1990).

The defendant also contends that had the judge charged the jury in accordance with his request that the house breaking felonies required a conscious

must establish that the defendant was a participant in a felonious enterprise independent of the homicide, that the felony was inherently dangerous,[5] as is armed robbery, *Commonwealth* v. *Tevenal,* 401 Mass. 225, 228-231 (1987), that the homicide occurred in the course of the felonious enterprise, and that the death must have been the natural and probable consequence of the felony. *Commonwealth* v. *Ortiz,* 408 Mass. 463, 466-467 (1990). The homicide need not occur during the armed robbery, as long the homicide was connected to the armed robbery and "the homicide[] took place at substantially the same time and place. It would be enough if the homicide[] occurred as part of the defendant's effort to escape responsibility for the underlying felony." *Id.* at 466. See *Commonwealth* v. *Dellelo,* 349 Mass. 525, 529-530 (1965).

The defendant argues that the killing of Chief Mortell was not the natural and probable consequence of the armed robbery and that it did not take place at substantially the same time and place. As we have discussed earlier, the homicide took place while the men were fleeing on foot from the assaults and from the armed robbery and after they had seen a police cruiser coming toward them. While the place of the killing was 1.2 nautical

---

disregard for the risk to human life, the jury not only would have determined that the house breaks were not underlying felonies for the homicide, but would also not have been "nudged" to find that the defendant participated as a joint venturer in the gun-related events at the reservoir. The contention is implausible. The connection between the house breaks, the unfortunate entry into the reservoir area, and the jury's determination that the defendant participated in the offenses committed there did not depend on the judge's characterization of the house breaks or the absence of the defendant's requested instruction. The link was created by the facts, including the close temporal relation of the offenses at Kendall Road and at the reservoir area.

(b) *Armed assaults as underlying felonies.* The defendant's contention that the judge's sua sponte inclusion of the armed assaults as underlying felonies, despite their absence in the bill of particulars and despite the absence of a Commonwealth request for such inclusion, was not only erroneous but also "closed an open link between the house breaks and the alleged armed robbery, making a connection, which otherwise, would have been missing," is also without merit. The defendant was separately charged with the three assaults and there is no basis for believing that considering them also as underlying felonies provided a link which did not otherwise exist.

[5]In the alternative the crime must have been committed with a conscious disregard for the risk to human life. *Commonwealth* v. *Ortiz,* 408 Mass. 463, 466 (1990), and cases cited.

miles[6] from the location of the armed robbery, the shooting occurred within twenty to thirty minutes of the robbery, during the course of the venturers' flight, and was part of the "effort to escape responsibility for the underlying felony." *Commonwealth v. Ortiz,* 408 Mass. at 466. Even if the killing occurred after the venturers separated, the three "had a common purpose to resist capture . . . and . . . resort to shooting was likely as a means to accomplish that common purpose." *Commonwealth v. Dellelo,* 349 Mass. at 529. An armed robbery does not end because "one or [more] of the robbers cease[s] to desire to proceed, has in mind only a purpose to escape, and shoots in furtherance of that purpose." *Ibid.* Even though the armed robbery

> "may technically be said to be complete, if the homicide is committed while the killer is engaged in one of the elements incident to the crime such as an escape or flight, the killing is referable to the robbery; and whether the act of escape or flight is a continuous part of the . . . crime is for the jury to determine."

*Id.* at 529-530. Here, the jury were warranted in finding that the interval in time and distance between the robbery and the shooting showed no detachment from the enterprise and that the shooting was one of the probable consequences of the armed robbery. *Id.* at 530-531.

3. *Judge's instructions.* Since the defendant did not object to the errors now urged in the judge's instructions, the standard is whether the errors, if any, created a substantial risk of a miscarriage of justice.

a. The defendant claims that the judge erred by giving instructions which apply to an accessory before the fact[7] and that this theory should only apply to someone who was not present at the scene of the armed robbery. This argument is disposed of by *Commonwealth v. Ortiz,* 424 Mass. at 856-857, in which the court held that the statutory scheme (G. L. c. 274, §§ 2 and 3) abrogates the distinction between principals and accessories

---

[6] The testimony was in nautical miles, presumably because the three men ran across the reservoir. A nautical mile is approximately 6,076 feet (about 1.151 miles). The American Heritage Dictionary 1205 (3d ed. 1992).

[7] The judge charged that the Commonwealth had to show that "the defendant actually did participate in some meaningful way in the offense either by counseling, hiring or otherwise procuring the principal to commit the crime or by . . . ."

before the fact and that a defendant "may also be convicted as a joint participant in a felony if [he or she] . . . is an accessory . . . before the fact by counselling, hiring or otherwise procuring such felony to be committed. G. L. c. 274, § 2." *Ortiz, supra* at 856.

b. The judge specifically charged that the Commonwealth had to establish that the defendant "knew that the person who acted (Souza) had a dangerous weapon, namely, a handgun."[8] In instructing the jury that the Commonwealth must prove that the defendant had knowledge that the other person (Souza) intended to commit the crime, the judge charged that the requirement is satisfied if the Commonwealth shows the defendant "knew that there was a substantial likelihood that the other person would commit the crime." This instruction was entirely correct, *Commonwealth* v. *Walsh*, 407 Mass. 740, 743 (1990); *Commonwealth* v. *Snow*, 34 Mass. App. Ct. 27, 32 (1993), and, contrary to the defendant's contention, did not derogate from the judge's instructions requiring the Commonwealth to prove that the defendant knew that Souza had a gun.

c. In his instructions on the felony predicates for a finding of murder in the second degree under the felony-murder rule, the judge explained that the rule was limited to those felonies that are inherently dangerous to human life and that in this case there were six felony charges which the jury could consider to form the basis of a felony-murder. The defendant argues that this instruction effectively directed a finding that the six charges were inherently dangerous to human life, thus impermissibly taking away the issue of malice from the jury.

Armed robbery and armed assault are, as matter of law, crimes inherently dangerous to human life. *Commonwealth* v. *Tevenal*, 401 Mass. at 230. See *Commonwealth* v. *Simmons*, 417 Mass. 60, 70-71 (1994) (armed robbery); *Commonwealth* v. *Walker*, 17 Mass. App. Ct. 194, 198 (1983) (armed assault). As to the house breaks, see note 4, *supra*, where we indicated, in a slightly different context, that the consideration of the house breaks without an instruction that the jury should determine

---

[8]Although the judge could have been more explicit as to when the defendant had such knowledge of the gun, the implication was that the knowledge had to be prior to the offense. In any event, in view of the defendant's own statement that Souza told him during the first house break that he had a gun, there is no substantial risk of a miscarriage of justice in the omission of an explicit instruction that the defendant had to have knowledge of the gun prior to the occurrence of the gun-related offenses.

whether they indicated a conscious disregard for the risk to human life created no prejudice. In the present context there is also no prejudice because, as we indicated earlier (see text accompanying note 4, *supra*), the validity of the house breaks as underlying felonies need not be established. See *Commonwealth v. Cruz*, 424 Mass. at 209.

4. *Other contentions concerning the trial.*

a. We have examined the autopsy photographs and conclude that this is not the "rare instance" in which their probative value is so overwhelmed by their inflammatory potential that a reversal is warranted. See *Commonwealth v. Westmoreland*, 388 Mass. 269, 279 (1983).

b. Although the defendant now challenges several remarks of the prosecutor in his closing which were unobjected to at trial, only one deserves discussion. Some background is required. During cross-examination of the defendant, the prosecutor asked him whether, since the day of his arrest, he had done "any reading on the law," particularly, about felony-murder or joint venture.[9] Over objection, the judge permitted these questions, but stated that "this obviously is irrelevant unless there is some further question which is relevant to this trial." When the prosecutor failed to connect the reading to anything relevant, the judge stated:

> "The jurors should not at least up to this point, draw any kind of an adverse conclusion because of the defendant looking into the law that relates to the charges against him. In and of itself that is not a thing that is to be considered against him."

During closing argument the prosecutor pointed to two statements in the defendant's written, signed account given to the police after his arrest which were inconsistent with his direct testimony at trial. In the written statement, the defendant had, as will be remembered, mentioned that Souza had, during the first house break, told him that he had a gun. The defendant's statement also indicated that at the reservoir site when the van had become stuck in the snow, the defendant had urged that they run, but Souza had replied, "No, we got to take them down." The defendant in direct examination, however, denied

---

[9]To the prosecutor's questions, the defendant answered that he had read about felony-murder but that he did not think he had read about joint venture.

both statements and strongly implied that he did not know that Souza had a gun with him until they reached the reservoir area.

In closing, the prosecutor commented:

> "I asked him, 'have you done any reading about felony-murder or about joint venture?' Think about that question and his answer when you read those statements and look at the things that he now wants to deny, and when you listen to the judge's instructions on felony-murder and joint venture."

While during cross-examination the prosecutor had not tied his questions to any relevant matter, in closing argument he pointed to the far more favorable answers the defendant had given at trial on the question of joint venture. The argument went directly to the credibility of the defendant, a matter properly the subject of argument. The judge's earlier ruling which included the phrase "at least up to this point" could readily have been interpreted as limiting the prosecutor only until he showed the relevance of what the defendant had read. Defense counsel's failure to object, after he had vigorously objected to this line of questioning during cross-examination, suggests that he, too, considered the limitation not applicable in the context of the prosecutor's argument. In any event, even if the judge's limitation were interpreted to have precluded argument on this point, the prosecutor's error did not rise to a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 274 (1982).

The defendant's suggestion, relying on *Commonwealth* v. *Person*, 400 Mass. 136, 139-141 (1987), and *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997), that the defendant's rights under the Fifth and Sixth Amendments to the United States Constitution were here violated are without merit. There was no reference to the defendant's silence, but rather to his inconsistent statement, see *Commonwealth* v. *Sherick*, 401 Mass. 302, 305 (1987); *Commonwealth* v. *Moore*, 408 Mass. 117, 130-131 (1990), and there was no reference to his consultation of counsel.

c. The defendant also faults trial counsel for a number of matters which we determine have not "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

We do not suggest that the alleged failures constituted conduct "measurably below that which might be expected from an ordinary fallible lawyer," *ibid.*, and note that the trial judge specifically told the jury that the lawyers in the case "are first class professionals who have done a good solid yeomen-like job."

d. The remaining contentions of the defendant are without merit.

5. *Sentencing matters.* The defendant's claim that the two daytime house breaks and the two larceny charges merged, precluding separate sentences for each of the charges, is not the law. See *Commonwealth* v. *Ford,* 397 Mass. 298, 302 (1986), and the decision of the Appeals Court in that case, 20 Mass. App. Ct. 575, 580 (1985). See also *Commonwealth* v. *Clemente,* 25 Mass. App. Ct. 229, 237 n.13 (1988). Separate sentences could therefore be imposed for each of the four offenses.

In addition to the sentence for second degree murder, the judge imposed concurrent sentences on each of the six underlying felonies. The defendant correctly argues that sentences for both the second degree murder under a felony-murder theory and the underlying felony are duplicative whether the sentences be consecutive or concurrent. *Commonwealth* v. *Berry,* 420 Mass. 95, 113-114 (1995). *Commonwealth* v. *Mello,* 420 Mass. 375, 398 (1995). *Commonwealth* v. *Bennett,* 424 Mass. 64, 69 (1997). The defendant would have us vacate the sentences on each of the six underlying felonies if the second degree murder conviction is upheld. Since the aim of the merger rule is to avoid duplicative sentences, the appropriate remedy where there is one underlying felony is to vacate both the conviction and sentence on the duplicative offense, and to affirm the conviction on the more serious offense. *Commonwealth* v. *Bennett, supra* at 69-70. Because we have upheld the defendant's conviction of second degree murder based on the felony of armed robbery, the conviction and sentence on armed robbery is to be vacated. The defendant was, and can legally be, sentenced only once for the murder of Chief Mortell. As a result, the sentences on each of the other felonies are not duplicative. See *Commonwealth* v. *Pennellatore,* 392 Mass. 382, 390 (1984). Accordingly, we vacate the judgment of conviction of armed robbery and the sentence imposed thereon and remand the matter to the Superior

Court for the entry of judgment consistent with this opinion. The remaining judgments are affirmed.

*So ordered.*