## Commonwealth vs. Michael D. Souza.

Worcester. October 6, 1998. - December 11, 1998.

Present: Wilkins, C.J., Abrams, Lynch, Fried, & Marshall, JJ.

*Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Voluntariness of confession, Instructions to jury, Required finding, Lesser included offense, Duplicative convictions, Capital case, Self-defense, Joint enterprise. *Self-Defense. Joint Enterprise. Robbery. Homicide.*

In a murder case, the record of a hearing on a motion to suppress the defendant's statements to police did not support the defendant's claim that the police improperly made promises designed to elicit the defendant's waiver of his Miranda rights [481-482]; and the motion judge's finding that police conduct from the defendant's arrest to his arraignment was not coercive, overbearing or deceptive was warranted by the evidence [482-484].

Evidence at a murder trial warranted the judge's instructing the jury on self-defense. [484-485]

No prejudice arose at a murder trial from the judge's instructing the jury, sua sponte and over the defendant's objection, on self-defense, in circumstances in which the instruction was favorable to the defendant and did not vitiate his defense. [485-487]

There was no merit to a defendant's claim that the prosecutor's argument on the evidence of self-defense improperly shifted the burden of proof. [487-488]

At the trial of an indictment for murder, the circumstantial evidence was adequate to support a conviction of the defendant as either a principal or a joint venturer, and it was immaterial that the jury did not specify the basis of their verdict of guilty. [488-489]

Evidence at the trial of an indictment for armed robbery was sufficient to warrant an inference by the jury that the defendant's taking of a truck at gunpoint to effectuate his escape was done with the intent to permanently deprive the owner of the truck. [489-491]

In the circumstances of a murder trial, the judge correctly refused to instruct the jury on involuntary manslaughter, where the evidence of the defendant's having shot at the victim eleven times and hitting him twice demonstrated a plain and strong likelihood that death would follow. [492-493]

Evidence at the trial of an indictment for larceny of a motor vehicle did not warrant instructions to the jury on the lesser included offenses of larceny, use of a motor vehicle without authority, or "carjacking," and no substantial likelihood of a miscarriage of justice arose from counsel's failure to request, and the judge's failure to give, such instructions. [493-494]

Where the jury in a murder case returned a verdict of murder in the first
degree on theories of both deliberate premeditation and felony-murder, the
underlying felonies were separate and distinct crimes and were not duplica-
tive. [494-495]

INDICTMENTS found and returned in the Superior Court Depart-
ment on March 22, 1994.

A pretrial motion to suppress evidence was heard by *Herbert
F. Travers, Jr.,* J., and the cases were tried before him.

*Stephen Neyman* for the defendant.

*James P. McKenna,* Special Assistant District Attorney, for
the Commonwealth.

MARSHALL, J. On March 29, 1995, a jury in the Worcester
Superior Court found the defendant guilty of murder in the first
degree on the theories of deliberate premeditation and felony-
murder. The jury also convicted the defendant of armed rob-
bery, breaking and entering in the daytime (two indictments),
unlawfully carrying a firearm, removing or defacing the
firearm's serial or identification number, assault by means of a
dangerous weapon (three indictments), larceny of a motor
vehicle, and larceny over $250 (two indictments).

The convictions arose from events surrounding the shooting
death of the chief of police of the town of Paxton, Robert J.
Mortell. He was shot while pursuing three men, believed to be
armed burglars, in a heavily wooded area in the town of Holden.

On April 14, 1995, the defendant filed notice of his appeal.
On January 14, 1997, he filed in this court a motion for a new
trial raising a single issue concerning an instruction on self-
defense. A single justice transferred the motion to the trial
court. On November 20, 1997, a judge in the Superior Court,
who was also the trial judge, denied the motion without a hear-
ing.

Represented by new counsel on appeal, the defendant chal-
lenges only his convictions of murder in the first degree and
armed robbery. He claims error in the denial of his motion to
suppress statements he gave to the police; the judge's giving of
an instruction on self-defense despite his request that no such
instruction be given; the judge's refusal to give a requested
instruction on involuntary manslaughter; the denial of his mo-
tion for a required finding of not guilty on the armed robbery
indictment; trial counsel's failure to request and the judge's

failure to give instructions on lesser included offenses of armed robbery and on felony-murder in the second degree; and trial counsel's failure to object to the form of the verdict slip for the murder indictment because it did not require the jury to specify whether they found that the defendant had acted as a principal or as a joint venturer. The defendant also challenges the armed robbery conviction on the ground that it is duplicative. We affirm the defendant's convictions and see no reason to grant any relief pursuant to our power under G. L. c. 278, § 33E.

1. *Facts.*[1] On the morning of February 1, 1994, the defendant and two others, Kenneth Padgett and Jamie Richards, committed two burglaries while armed with handguns supplied by the defendant. While the coventurers fled from the second burglary in a stolen van, the van collided with a city of Worcester department of public works (DPW) truck and lodged in a snowbank. A DPW crew was working nearby. The defendant and his coventurers then took the DPW truck at gunpoint. When that vehicle got stuck in the snow after a few hundred yards, they abandoned it and fled on foot.

Chief Mortell received word of the burglaries and the incident involving the city crew shortly afterward. Responding to a call for help from the Holden police, he saw three men running across a road into a thickly wooded area near the Kendall Reservoir. Leaving his car on the road, he pursued the men into the woods on foot. As he passed a bush behind which the defendant hid, the defendant shot him. Chief Mortell returned fire, and then collapsed. The defendant fired at him repeatedly, eleven times in all. The fatal shot entered the victim's left side, just under his armpit, traveled through his lungs and heart, exited his right side and lodged in the inside of his upper right arm. A second shot hit the victim while he was bent over. The defendant threw his gun into the snow and fled. The tracks in the snow suggested that the three coventurers split up near the

---

[1] Our recitation of the facts is taken entirely from the evidence introduced by the Commonwealth at trial. The defendant objects to the Commonwealth's inclusion in its appendix of statements made to the police by Padgett and Richards after their respective arrests. The statements were not introduced in evidence at the trial in this case. They were introduced at the joint hearing on the motions to suppress the statements filed by each of the three coventurers, but the statements were not relevant to any issues pertaining to the defendant's motion to suppress and were not referred to by the motion judge in ruling on Souza's motion. We have not referred to the statements of Padgett and Richards or relied on them in any respect in reaching our decision.

location of the victim's body: Padgett and Richards went in one direction, the defendant went in another. The police apprehended the defendant shortly after the shooting, and apprehended Padgett and Richards the following day.[2]

2. *Suppression of the defendant's statements.* The defendant first claims that, because of an improper inducement by the police, the waiver of his Miranda rights and his subsequent statements to the police were not voluntary and should have been suppressed. At the scene of his arrest in the woods, the defendant received Miranda warnings and indicated that he understood them. He was taken to the Holden police station, where he was first interviewed by State Trooper Robert O'Keefe and Holden Detective Albert Bourget for approximately forty minutes. At the beginning of the interview Trooper O'Keefe again informed the defendant of his Miranda rights. Trooper O'Keefe then told the defendant it was in his "best interest" to "set the record straight" and tell them what happened that day.[3] The defendant characterizes O'Keefe's statement as "unsolicited advice of a legal nature" designed to elicit a waiver of his rights in violation of *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). In *Meehan, supra*, we said that an officer may suggest that it would be " 'better' for a suspect to tell the truth," but that "an assurance, express or implied," that a statement "will aid the defense or result in a lesser sentence" is prohibited. *Id.*, and cases cited. More recently, we held that an officer's suggestion that it would be in the defendant's "best interests to get out his side of the story" did not violate the prohibitions of *Meehan*, "and was

---

[2]The conviction of Kenneth Padgett of murder in the second degree on a theory of felony-murder and of ten other offenses was affirmed on appeal. *Commonwealth* v. *Padgett*, 44 Mass. App. Ct. 359 (1998). On July 5, 1995, Jamie Richards pleaded guilty to murder in the second degree and other offenses.

[3]At the hearing on the motion to suppress, Trooper O'Keefe testified as follows: "We began by telling him again why we were there, and we thought that he should speak to us in regards to this matter. Especially after we had learned that he was Michael Souza, that he had been arrested for [breaking and enterings] before and so forth. In fact, the investigation included [breaking and enterings] in the town of Holden. We said to Michael that we thought it was in his best interest to deal with us at this point, to set the record straight in regards to what happened today. We said, 'What happened today?' During these questions that we're asking Michael, Michael would momentarily cry and he would state, 'What does it matter? Nothing matters. I've [*sic*] never going home again. I'm never going to see my kid again. A cop got shot.' "

more closely related to 'suggest[ing] broadly that it would be "better" for a suspect to tell the truth,' which we have expressly allowed police officers to do." *Commonwealth* v. *Raymond*, 424 Mass. 382, 395-396 (1997), quoting *Commonwealth* v. *Meehan*, *supra* at 564.

Trooper O'Keefe's statement to the defendant is all but identical to the one at issue in *Raymond* and, for the reasons we explained in that case, fell within the permissible zone of questioning. *Id.* at 395-396. We do not agree with the defendant that the officer's statement "implicitly assures something short of a prosecution for first degree murder." The officer made no promises of any kind to the defendant, express or implied. *Commonwealth* v. *Meehan*, *supra* at 564.

The defendant also argues that his statements were the product of physical and psychological intimidation. We conclude that the judge's finding that the police conduct from the time of the defendant's arrest until his arraignment "was not coercive or otherwise overbearing or deceptive" is warranted by the evidence. See *Commonwealth* v. *Raymond*, *supra* at 395. At the Holden police station, the defendant was placed in a cell and told to remove his clothing, except his underwear. The defendant was given a blanket to cover himself, and taken to an interview room approximately eight feet by ten feet. He was seated in a chair in a corner directly across from a glass paneled door, and was handcuffed to a bar on the wall, where he remained until he was arraigned later that afternoon. The defendant points to the fact that he was questioned by a series of officers over approximately three and one-half hours. After the initial forty-minute interrogation, a Worcester detective interviewed the defendant for approximately one and three-quarter hours.[4] A State trooper also interviewed the defendant for approximately twenty minutes.[5] The judge's conclusion that the interviews, conducted in the middle of the day, were "not a stratagem designed to wear [the defendant] down" but were reasonable and investigative is fully supported: the defendant was a suspect in the murder of a police officer, and the subject of an investigation in which several local police departments and the State police were involved.

[4]The detective was sent from Worcester to conduct the interview because he thought he knew the defendant. He immediately realized that he was mistaken, but nevertheless continued the interview.

[5]The trooper was also sent to interview the defendant because he thought he knew him, but realized immediately that he, too, was mistaken.

The defendant further claims that he was "humiliated" and "deprived of his dignity" because he was questioned while stripped of his clothing, handcuffed to a bar in a small room, observed in this condition by percipient witnesses and deprived of his privacy. We would not tolerate the custodial interrogation of a suspect who is nude. See *Commonwealth v. Collins*, 11 Mass. App. Ct. 126, 131 (1981) (the "coercive effect of being nude during custodial interrogation is well settled"). But the defendant was not nude; he was permitted to wear his underwear and the police provided him with a blanket to cover himself. The removal of his clothing was not for coercive purposes: the police had a legitimate interest in preserving his clothing as possible evidence. The judge also made no error in concluding that the police took reasonable precautions by handcuffing the defendant to a bar: the defendant was an escape risk.[6] He makes no claim that the handcuffs caused him any pain, nor does he suggest that he was in any other kind of discomfort.[7] Five workers from the Worcester DPW arrived at the Holden police station during the interrogation and looked at him through the glass door. The judge found this was for the purpose of identifying the suspect. For the police to seek assistance in identifying a suspect in this manner is not inappropriate.

"The test for voluntariness of a confession[8] is 'whether, in light of the totality of the circumstances surrounding the mak-

[6]The judge found that during one interview the defendant said that "everything had gone wrong," and that the police "could let him escape out the door and then shoot him." He said that "he would not go to trial, that he would take his own life first." He found that the defendant told another officer that "in all likelihood the other suspects would be apprehended and that there was nothing they could say that would help him." See note 3, *supra.*

[7]Near the end of the third interview, the trooper noticed some dried blood in the defendant's ear. The defendant then indicated for the first time that he was injured. The defendant was examined and treated later in the day at the infirmary at the jail and then at St. Vincent's Hospital, where it was discovered that he had suffered a ruptured eardrum. The defendant's medical history indicated that he had long-term difficulties with that ear. The judge concluded that it was impossible to determine whether the rupture had occurred in connection with his arrest. The judge also concluded that the injury to the defendant's ear did not cause him any particular distress until just before he was arraigned. His findings are supported by the evidence.

[8]The defendant did not confess to the shooting of the victim. The judge found that "[m]ost of the statements made by him were quite guarded and designed to allow himself to later explain his actions as well as could be done under the circumstances. He provided only the information he wished to provide and he did so very carefully."

ing of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.' " *Commonwealth* v. *Raymond, supra* at 395, quoting *Commonwealth* v. *Selby,* 420 Mass. 656, 663 (1995). On our own review of the record of the hearing, we are satisfied that the defendant's statements were voluntary. *Id.*[9]

3. *Self-defense instruction.* The defendant next claims that the judge committed reversible error by instructing the jury on self-defense over his objection.[10] First, he says, the instruction was not warranted by the evidence. Were the defendant correct — and we conclude he is not — any error would not be prejudicial. A defendant is rarely prejudiced when a judge has given an instruction on self-defense to which he is not entitled because the instruction is generally "more favorable to the defendant than he deserved." *Commonwealth* v. *Torres,* 420 Mass. 479, 492 (1995). See *Commonwealth* v. *Curtis,* 417 Mass. 619, 632 (1994) (where defendants were not entitled to any instruction on self-defense, "whatever the judge said about self-defense, and the use of excessive force in self-defense, was more favorable to the defendants than they deserved and could not have prejudiced their positions"). We conclude, however, that the evidence did support an instruction on self-defense.

During his postarrest interrogations the defendant told the officers, "I'm a [breaking and entering] guy. Maybe I've committed some [breaking and enterings]. But just because someone is [breaking and entering], doesn't give the police the right to shoot them." When asked if he was suggesting that the police fired first, the defendant responded, "If I'm given a chance to

---

[9]The defendant also claims error in the judge's failure to give the jury a humane practice instruction sua sponte. The voluntariness of the defendant's statements to the police was not a live issue at trial. *Commonwealth* v. *Tavares,* 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982). There is, in any event, no substantial likelihood of a miscarriage of justice because the defendant waived his rights and made his subsequent statements voluntarily.

[10]The judge instructed the jury:

"The evidence in this case raises the issue of whether this killing was justified or excused as a result of acts of self-defense. The defendant does not bear the burden of proving the justification or excuse. Rather, the Commonwealth must prove to you beyond a reasonable doubt that the killing was not the result of the defendant's acts of self-defense. If it fails in its burden to prove the killing was unlawful and not in self-defense, then you need not proceed further, but must return a verdict on the entire charge of murder, that is, not guilty of murder in the first degree, and the lesser included charges of murder in the second degree, and manslaughter."

stop, I stop," a statement he repeated on several occasions. He also stated three times that "he was being shot at, he had no choice." Those statements were in evidence. Collectively, they permit an inference that the victim, rather than the defendant, fired the first shot or shots.[11] We recognize that there was scant evidence from which the jury could have concluded that the defendant, assuming that he had not been the first to fire, used no more force than was reasonably necessary. See *Commonwealth* v. *Torres, supra,* quoting *Commonwealth* v. *Curtis, supra* at 632. Nevertheless, taking the facts in the light most favorable to the defendant, *Torres, supra* at 492, we cannot conclude that it was error for the judge to interpret the defendant's postarrest statements as requiring a self-defense instruction.[12] See *Commonwealth* v. *Reed,* 427 Mass. 100, 102 (1998).

The defendant's second claim that, even if warranted by the evidence, it was reversible error for the judge to give a self-defense instruction sua sponte and over his express objection raises a different question. The defendant did not present a self-defense theory to the jury; at trial he never contended that self-defense played any role in the case. He claims the instruction violated his right to choose his theory of defense and vitiated his "rather strong" defense that he was not the shooter who killed the victim.[13] " 'It is the rule that where the issue of self-defense has been sufficiently raised *by the evidence,* the defendant is entitled to an instruction which places on the Commonwealth the burden of disproving the factor of self-defense

---

[11]At trial a police officer who had joined in the search for the armed burglars testified that someone other than the victim fired the initial volley of shots. The jury were not required to believe that evidence.

[12]In denying the defendant's motion for a new trial, the judge stated that "the jury could have inferred that the defendant was a house breaker who on the day in question was fleeing with two accomplices after having committed a number of house breaks. It was his practice under those circumstances in the past when he was told to stop fleeing by the police he always did so. In other words, he did not resist arrest, but gave up immediately and peacefully." It was the judge's view that this evidence "required an explanation to the jury of the law of self-defense."

[13]The motion judge noted that the relationship between the defendant's trial strategy and the instruction on self-defense "became much clearer during the closing arguments when the defendant raised the argument for the first time that a codefendant was the shooter." We note that in his opening statement defense counsel told the jury that the evidence would show that the defendant was not the shooter.

beyond a reasonable doubt' " (emphasis supplied). *Commonwealth* v. *Curtis, supra* at 631, quoting *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). We have also said that a judge "*must* instruct on self-defense in a homicide case if the evidence most favorable to the defendant warrants a reasonable doubt whether 'the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case' " (emphasis supplied). *Commonwealth* v. *Torres, supra* at 492, quoting *Commonwealth* v. *Curtis, supra* at 632. But we have not addressed previously whether a defendant may veto a self-defense instruction in a case where the evidence may warrant the instruction.

Although a defendant's trial strategy is respected, *Breese* v. *Commonwealth*, 415 Mass. 249, 251 (1993), and although there was no requirement that the judge give a self-defense instruction because there was no such request from the defendant or the Commonwealth, we conclude that in this case it was not prejudicial to do so. First, the defendant's story to the police — a story that the jury, correctly, were permitted to hear — suggested that he had no choice but to shoot at his pursuer. There was, of course, conflicting evidence that undermined the story the defendant gave to the police. But the jury reasonably could have concluded that a police officer pursuing a suspect might have fired one or more shots first. See note 11, *supra*. The self-defense instruction was favorable to the defendant precisely because it permitted the jury to consider that evidence in a way that was wholly beneficial to him.[14] Second, to negate the element of malice, the defendant requested and the judge gave an instruction on hot blood upon sudden combat[15]; the evidence, he said, supported the conclusion that the victim was the first to

---

[14]The defendant's reliance on *Commonwealth* v. *Deeran*, 10 Mass. App. Ct. 646, 649 (1980), is misplaced. In that case, the judge concluded, and the Appeals Court agreed, that the evidence was insufficient to raise the issue of self-defense. *Id.* at 648-649.

[15]The defendant requested the following instruction:

" 'HOT BLOOD' ARISING FROM SUDDEN COMBAT. If you have a reasonable doubt concerning whether the defendant acted with malice, as I have described it, you may not find the defendant guilty of murder. If,

shoot. In requesting that instruction, the defendant must have concluded that the jury might disbelieve his defense that he was not the shooter. The self-defense instruction similarly anticipated that the jury might disbelieve the defendant's story that he was not the shooter. Any prejudice that the defendant claims resulted from the self-defense instruction is no different than the "prejudice" that resulted from the hot blood upon sudden combat instruction he requested and received.[16]

Finally, the defendant claims that the self-defense instruction gave the Commonwealth an opportunity to comment unfavorably on such a defense in its closing argument and thereby shifted the burden to the defendant to justify his earlier statements to the police suggesting that he acted in self-defense.[17] Here, the prosecutor based his closing argument on the evidence,

---

however, you are convinced beyond a reasonable doubt that an intent 1. to kill, 2. to do serious bodily harm, or 3. to do an act creating a plain and strong likelihood that death would follow, arose in the defendant's mind but you are not persuaded beyond a reasonable doubt that such intent did not arise when he was in a state of hot blood upon sudden combat, you shall find the defendant guilty of manslaughter."

The judge agreed with the defendant's request and instructed the jury:

> "Voluntary manslaughter is an unlawful, intentional killing without malice resulting from a sudden transport of the passions of fear, anger, fright, nervous excitement or heat of blood when there is no time to deliberate, and when such passion or heat of blood is produced by sudden combat. And that passion produced by sudden combat is such that it will be likely to produce in an ordinary person, an abnormal state of mind and did actually produce such a state of mind in the defendant."

[16]The defendant also requested an instruction on involuntary manslaughter, discussed *infra*, that ostensibly created the same type of "prejudice."

[17]The prosecutor argued in closing, "He's confronted with the possibility, ladies and gentlemen, that others are going to get caught and provide evidence or other evidence will come up, or that somebody might give a statement, what does he do? He changes his mode and he goes into the self-defense mode. Think about that. 'When I'm told to stop, I stop. He just kept shooting, I had no choice.' Is there any ambiguity about that comment? Is there anything left to guesswork? 'He just kept shooting, I had no choice.' You already know who the shooter is. . . .

"And when [other] evidence came in, the bullet going in here from the side . . . and the chief's . . . left side exposed to his shooter . . . when that evidence came in, the gig was up. The self-defense wasn't going to work anymore. He knew when this evidence came in . . . the self-defense wasn't going to work. Self-defense wasn't going to work so, now it is Plan B. Now it is blame Kenneth Padgett."

and it would have been proper even in the absence of an instruction on self-defense. See *Commonwealth* v. *Connor*, 392 Mass. 838, 853 (1984). The "opportunity" to make the argument arose from the defendant's own statements to the police, not from any anticipation that the judge would give a self-defense instruction. Nor was the burden shifted to the defendant. The judge instructed the jury that the Commonwealth bore the burden of proving that the defendant had not shot the victim in self-defense, and the burden of proof never shifted.

4. *Joint venture theory of murder.* The judge instructed the jury on individual liability and joint venture theories of murder. The defendant claims that the evidence was insufficient to warrant a finding that he acted not as the shooter, but as a joint venturer,[18] and because the jury were not asked to specify on which basis — principal or joint venturer — he was guilty, he may have been convicted improperly as a joint venturer. Viewing the facts in the light most favorable to the Commonwealth, there was adequate evidence to support a conviction of murder on a theory of joint venture. It is, therefore, immaterial that the jury did not specify whether they convicted him as a principal or a joint venturer. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992).

To prove joint venture beyond a reasonable doubt, the Commonwealth had to establish that the "defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996). See *Commonwealth* v. *Semedo*, 422 Mass. 716, 719 (1996) (Commonwealth must show that defendant "shared with the principal the mental state required for the crime of murder"). The defendant complains that there was no evidence even "remotely suggesting" that either Padgett or Richards had ambushed the victim and the defendant could only have been convicted as a principal.[19] We disagree. To support a joint venture conviction, "[t]he inferences drawn by the jury need

[18]The defendant does not contend that there was insufficient evidence to support the conviction of premeditated murder, i.e., that he acted as the principal.

[19]Trial counsel took a different position. He told the jury that it was Padgett who had shot the victim: "And it is clear, ladies and gentlemen, from the evidence in this case, that [the shooter] is Kenneth Padgett." Similarly, on ap-

only be reasonable and possible and need not be necessary or inescapable," *Commonwealth* v. *Brooks,* 422 Mass. 574, 577 (1996), and cases cited. The evidence meets that standard. All three coventurers fled into the woods together. At some point they parted, but the evidence concerning their tracks in the snow is not inconsistent with a theory that Padgett and the defendant had hidden close to each other[20] and waited for the victim to approach before Padgett or the defendant shot the victim. The defendant knew that at least one of his coventurers was armed, and there was overwhelming evidence that one or another of the coventurers shot the victim. "Direct evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[]." *Commonwealth* v. *Cohen, supra* at 381, quoting *Commonwealth* v. *Casale,* 381 Mass. 167, 174 (1980). See *Commonwealth* v. *Brooks, supra* at 577 ("[a]lthough there was no direct evidence that the defendant fired a gun, there was sufficient circumstantial evidence that the defendant was either one of the shooters or had joined in the others' intent"). While the Commonwealth did not dwell on this theory of liability, the evidence was sufficient to convict the defendant on this basis.

5. *Sufficiency of the evidence: armed robbery.* The indictment for armed robbery was tied to the events surrounding the confrontation between the coventurers and the DPW crew. By a motion for a required finding of not guilty, denied by the judge before he instructed the jury, the defendant raised the question whether sufficient evidence existed to convict him of armed robbery. He claimed that the Commonwealth had not proved that he intended permanently to deprive the owner of — that is, to steal — its DPW truck.[21] He challenges the judge's denial of his motion.

"The standard for evaluating a motion for a required finding of not guilty is 'whether, after viewing the evidence in the light

---

peal the defendant insists that his only defense at trial was that Padgett had killed the victim.

[20]Trial counsel told the jury, "[M]aybe you believe from the evidence that maybe [the defendant] was . . . sitting next to Padgett when Padgett was firing. It is not the only conclusion you can reach."

[21]General Laws c. 265, § 17, states in relevant part: "Whoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of larceny shall be punished by imprisonment in the state prison for life or for any term of years . . . ."

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (emphasis in original). *Commonwealth* v. *James*, 424 Mass. 770, 784 (1997), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). "One who takes property without the authority of the owner and so uses or disposes of it as to show indifference whether the owner recovers possession may be found to intend to deprive the owner of it permanently." *Commonwealth* v. *Salerno*, 356 Mass. 642, 648 (1970).[22] There was evidence that the truck was taken at gunpoint and that the defendant and his coventurers drove off in the truck. The jury could have inferred that the defendant intended to drive the truck to effectuate his escape and that he did not intend to return it. This was no "joyride."[23] See *Commonwealth* v. *Pena*, 39 Mass. App. Ct. 332, 334 (1995), citing *Commonwealth* v. *Latimore*, *supra* at 677-678. The judge properly submitted this issue to the jury. "Whether the taking was larcenous was for the jury to decide on all the evidence." *Id.* "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Commonwealth* v. *Pena*, *supra* at 334, quoting *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981). We do not agree with the defendant that he took the city vehicle as an "afterthought" in response to the "offer" of the foreman. The defendant was intent on escaping and secured an escape vehicle at gunpoint. See *Commonwealth* v. *Padgett*, 44 Mass. App. Ct. 359, 364 (1998). It matters little that he was forced to abandon the stolen vehicle shortly afterward.[24] The judge properly denied the defendant's motion

---

[22]As discussed below, the judge erroneously instructed the jury on this element of the offense.

[23]See J.R. Nolan & B.R. Henry, Criminal Law § 346, at 258 (2d ed. 1988) ("If a person should take an automobile, the property of another for a 'joy ride' and returns it within a short time to the place where it was taken, a charge of larceny would be difficult to sustain").

[24]The Commonwealth relies on *State* v. *Houseman*, 70 Ohio App. 3d 499 (1990), which we find persuasive. In that case, a fleeing felon crashed and abandoned a truck he had stolen at gunpoint. *Id.* at 505. The court stated:

"It would not have been reasonable for the jury to find against the state on the element of purpose to deprive the owner of property. It is evident from the events occurring that appellant intended to use the truck to escape. The fact that he was unsuccessful in using the . . . truck to escape because he wrecked it in the attempt does not mean the jury

for a required finding of not guilty of armed robbery.[25]

One further aspect of the defendant's claim requires comment. We have sustained a conviction of larceny for the taking of a vehicle to effectuate an escape because the intent to deprive the owner permanently *may* be found where the defendant uses or disposes of the vehicle so "as to show indifference" whether the owner recovers possession of it. *Salerno, supra* at 648. See *Commonwealth* v. *Padgett, supra* at 364, citing *State* v. *Barts*, 316 N.C. 666, 690 (1986) (taking and subsequent abandonment of truck indicated complete lack of concern as to whether the owner ever recovered it and constituted sufficient evidence of an intent to deprive the owner permanently of his property). After the judge gave the jury an initial instruction that was consistent with our holding in *Salerno*, defense counsel challenged the instruction. He argued that it was erroneous to instruct the jury "to the effect that that would include any indifference to whether or not the owner recovered. I believe there must be a specific intent to permanently deprive." The judge agreed, apparently relying on *Commonwealth* v. *Moore*, 36 Mass. App. Ct. 455, 457 (1994).[26] Accordingly, the judge revised his initial instruction and told the jury that the defendant's

could have reasonably determined this element of the offense was not proven by the state."

*Id.* at 506. See *State* v. *Barts*, 316 N.C. 666, 690 (1986).

[25]On appeal, the defendant also claims, for the first time, that the judge erred in denying his motion for a required finding of not guilty because insufficient evidence existed to prove that he took the truck by force or by placing the victim in fear. This contention is without merit. The defendant brandished a nine millimeter handgun, ordered the city workers to the ground, fired a shot in the air, and twice pointed his gun at the crew foreman. This was "objectively menacing conduct by the defendant, *Commonwealth* v. *White*, 110 Mass. 407, 409 (1872), undertaken with the intent to put the victim in fear for the purpose of stealing his property, *Commonwealth* v. *McCarthy*, 360 Mass. 566, 568 (1971), and resulting in reasonable fear or apprehension on the part of the victim, facilitating the theft, *Commonwealth* v. *Richards*, 363 Mass. 299, 304 (1973)." *Commonwealth* v. *Marcotte*, 18 Mass. App. Ct. 391, 394 (1984). The issue of force was properly submitted to the jury.

[26]In fact *Commonwealth* v. *Moore*, 36 Mass. App. Ct. 455, 457 (1994), did not alter our holding in *Commonwealth* v. *Salerno*, 356 Mass. 642, 648 (1970). *Moore* held that it was erroneous for a judge to instruct that the jury must find the defendant "to have intended to permanently deprive the owner of the property *or* . . . to have taken the property without authority in a state of mind wherein he was indifferent to whether [the owner] ever got it back or not. He's *either* got to intend to permanently interfere with the ownership of the property *or* be indifferent to whether the defendant got it back or not"

indifference to the city's recovery of its truck would not be sufficient to prove the element of permanent deprivation.[27] The revised instruction, argues the defendant, is indicative of the judge's own conclusion that evidence of the use of the vehicle merely to escape would not be sufficient to prove larceny and would "eradicat[e]" the element of permanent deprivation. The judge's revised instructions to the jury were erroneous, but are not challenged by the defendant. The defendant concedes that the judge's initial (and correct) instructions, "if considered by the jury, could have conceivably justified a robbery conviction." In these circumstances, there is no substantial likelihood of a miscarriage of justice even though the jury considered the evidence through the lens of an erroneous instruction.

6. *Involuntary manslaughter.* The defendant claims that the judge erred in refusing to instruct the jury on involuntary manslaughter. "An instruction on involuntary manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder." *Commonwealth* v. *Pierce,* 419 Mass. 28, 33 (1994), citing *Commonwealth* v. *Sires,* 413 Mass. 292, 301 (1992). During a lobby conference, defense counsel told the judge that the jury could conclude that the defendant fired at the victim in order to slow him down, and that such an action would constitute wanton and reckless conduct, as opposed to an intentional killing. The judge was correct to refuse to give the instruction.

An involuntary manslaughter instruction is warranted if death

---

(emphasis in original). *Id.* at 457. In other words, in that case the judge erroneously instructed the jury that they *must* find that the defendant intended permanent deprivation if they found that he was indifferent as to whether the owner recovered possession, making it easier for the jury to find the required intent.

[27]The judge instructed: "When I was discussing the charge of armed robbery, I made a statement to you regarding one of the elements of that offense which I wish to correct. I won't repeat [it] in its entirety. When I was discussing about the intent that the offender must have to permanently deprive the owner of his property, and that that intent can be inferred if the jury so chooses from a defendant's words or conduct, I gave an example that said that such an intent to steal may be inferred where a person takes property without the owner's permission and then uses or disposes of it in a way which shows indifference as to whether the owner recovers possession or not. I am going to strike that and ask you to disregard it. So far as it states this concept of using or disposing of property in a way which shows indifference. Rather, the intention of the person stealing, taking property, must be the intention of depriving the owner of it permanently."

was "the unintentional result of an act committed with such disregard of its probable harm to another as to amount to wanton or reckless conduct."[28] *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994). But "[a]n involuntary manslaughter charge is not required when it is obvious that 'the risk of physical harm to the victim creates a "plain and strong likelihood that death would follow." ' " *Commonwealth* v. *Brooks*, *supra* at 578, quoting *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993).[29] The victim was shot twice, once through the heart, and once in the back while he was kneeling down and bent over. Another bullet hit the tree against which the victim fell, lodging near where his head rested. The defendant fired at least eleven times, emptying the magazine of his nine millimeter handgun. It is obvious that a "plain and strong likelihood that death would follow" can be found in these actions, making an involuntary manslaughter charge unsupportable. See *Commonwealth* v. *Brooks*, *supra* at 578. See also *Commonwealth* v. *Johnson*, 426 Mass. 617, 623 (1998) ("defendant shot his victim three times, twice after he had fallen and was lying helpless in the street. There can be no doubt that [he] subjectively understood that a plain and strong likelihood of death would result from his actions").

7. *Lesser included offense instructions.* The defendant claims that his trial counsel's failure to request, and the judge's failure to give, jury instructions on larceny, use without authority, and "carjacking," as lesser included offenses of armed robbery, as well as a corresponding instruction on second degree felony murder, created a substantial likelihood of a miscarriage of justice.[30] "As a general rule, the jury should receive an instruction on a particular offense where: (1) the offense is, as a matter

---

[28]"A verdict of involuntary manslaughter is possible only where the defendant caused an unintentional death (1) during the commission of an act amounting to wanton or reckless conduct, or (2) during the commission of a battery." *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). The defendant requested that the judge instruct the jury on the wanton and reckless conduct prong of involuntary manslaughter only.

[29]The evidence also does not support the inference that the victim's death occurred unintentionally during the commission of a nonfelonious battery. See *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993). Shooting the victim with a gun constitutes the felony of assault and battery by means of a dangerous weapon. G. L. c. 265, § 15A (*b*).

[30]Because the defendant did not preserve these issues for appeal, we review them to see whether the errors, if any, created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Williams*, *ante* 383, 387 (1998).

of law, a lesser included offense of the crime charged; and (2) 'the evidence provides a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense.' " *Commonwealth* v. *Donovan*, 422 Mass. 349, 352 (1996), quoting *Commonwealth* v. *Santo*, 375 Mass. 299, 305 (1978). "Even when evidence is introduced that would justify conviction for a lesser included offense, the defendant is not entitled to an instruction thereupon unless the proof on the 'elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.' " *Commonwealth* v. *Egerton*, 396 Mass. 499, 504 (1986), quoting *United States* v. *Brischetto*, 538 F.2d 208, 209 (8th Cir. 1976). See *Commonwealth* v. *Pearce*, 43 Mass. App. Ct. 78, 81 (1997), *S.C.*, 427 Mass. 642 (1998) ("the jury must be presented with some rational basis on which to reject the Commonwealth's proof on one or more of the requisite elements of the greater offense"). Larceny and use of a motor vehicle without authority are lesser included offenses of armed robbery, as is "carjacking" in the circumstances of this case.[31] The omission of these instructions did not create a substantial likelihood of a miscarriage of justice where the evidence was uncontroverted that the defendant, armed with a nine millimeter handgun, took the truck at gunpoint from the foreman, who had been in lawful possession of and driving it immediately beforehand.

8. *Duplicative conviction.* The defendant urges us to vacate his armed robbery conviction because, he claims, it is duplicative of his conviction of murder in the first degree on the theory of felony-murder, with armed robbery as the underlying felony. The jury specified, and the evidence supports, that the defendant's conviction of murder was based on a theory of deliberate premeditation and on a theory of felony-murder. Because the former is an "additional, independent basis . . . for the conviction of murder in the first degree, a separate sentence for the underlying felony is appropriate." *Com-*

---

[31]See *Commonwealth* v. *Smith*, 44 Mass. App. Ct. 394 (1998), holding that unarmed robbery and carjacking constitute separate offenses because each requires proof of an element that the other does not, but noting that "where the *indictment* specifies that a car was the object of the unarmed robbery, carjacking might . . . be a lesser included offense of unarmed robbery, even under the elements-based test of *Commonwealth* v. *Morey*, [108 Mass. 433, 434 (1871)]" (emphasis in original). *Id.* at 397 n.2. In this case the Commonwealth did indict the defendant for robbery of a motor vehicle.

*monwealth* v. *Payne*, 426 Mass. 692, 702 (1998), citing *Commonwealth* v. *Raymond*, *supra* at 396-397; *Commonwealth* v. *Buckley*, 410 Mass. 209, 222 (1991).

9. We have reviewed the record in accordance with our statutory obligations under G. L. c. 278, § 33E, and determine that there is no substantial likelihood of a miscarriage of justice in the defendant's convictions. We have considered and rejected each of the defendant's claims of legal error. We further observe that to escape arrest, the defendant ambushed a pursuer whom he reasonably must have known was a law enforcement officer. Had the defendant surrendered, as he readily could have, the homicide of the officer would in all likelihood have been avoided. In these circumstances the interests of justice do not warrant a reduction of the crimes of which the defendant was convicted.

*Judgments affirmed.*