NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12214

COMMONWEALTH  vs.  ALEXANDER GALLETT
(and five companion cases[1]).


Suffolk.     December 7, 2018. - March 20, 2019.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide.  Robbery.  Felony-Murder Rule.  Constitutional Law,
    Admissions and confessions, Voluntariness of statement,
    Confrontation of witnesses.  Evidence, Admissions and
    confessions, Voluntariness of statement, Joint enterprise,
    Statement of codefendant, Cross-examination.  Telephone.
    Joint Enterprise.  Practice, Criminal, Capital case, Motion
    to suppress, Admissions and confessions, Voluntariness of
    statement, Instructions to jury, Comment by judge,
    Confrontation of witnesses.



    Indictments found and returned in the Superior Court
Department on November 2, 2010.

    Pretrial motions to suppress evidence were heard by Charles
J. Hely, J., and Janet L. Sanders, J., and cases were tried
before Linda E. Giles, J.


    Jeffrey L. Baler for Alexander Gallett.
    Andrew S. Crouch for Michel St. Jean.

---

[1] Two against Alexander Gallett and three against Michel St.
Jean.

Sarah Montgomery Lewis, Assistant District Attorney (Jennifer Hickman, Assistant District Attorney, also present) for the Commonwealth.

CYPHER, J.  On September 1, 2010, Richel Nova (victim) was robbed and stabbed to death after being lured to a vacant house in the Hyde Park section of Boston.  A jury convicted the defendants, Alexander Gallett and Michel St. Jean, of murder in the first degree by reason of extreme atrocity or cruelty and felony-murder.[2]  The defendants raise various arguments on appeal.  Gallett contends that the motion judge erred in denying his motion to suppress statements that he made to police during his interrogation.  St. Jean argues that there was insufficient evidence to support the murder conviction; he was prejudiced by the admission of statements from Gallett's redacted police interrogation; he was prejudiced by the admission of his own redacted statements; the judge erred in denying his requests for various jury instructions; and the judge improperly invoked juror sympathy.  In addition, Gallett and St. Jean argue that the judge erred both in limiting the cross-examination of certain witnesses and in declining to give a humane practice jury instruction.

---

[2] The defendants were also convicted of armed robbery and of breaking and entering in the nighttime with the intent to commit a felony.

For the reasons stated infra, we affirm the defendants' convictions.  After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce the verdicts of murder in the first degree.

Background.  We briefly recite the evidence that the jury could have found, reserving pertinent facts for the discussion of the defendants' arguments.  In addition, we reserve the facts that the motion judge found for the discussion of Gallett's motion to suppress.

During the afternoon of September 1, 2010, St. Jean, Gallett, and Gallett's girlfriend, Yamiley Mathurin, were together at Aline Valery's house in Hyde Park.  Valery overheard the defendants and Mathurin concocting a plan to rob someone.  Valery left her house, but the defendants and Mathurin stayed behind.

Gallett and St. Jean both owned knives.  Gallett's knife was larger than a pocket knife.  When opened, the blade would "cover the whole hand."  St. Jean's knife was smaller; the handle and blade both fit into the palm of a hand when opened.  Gallett usually carried a knife whenever he left the house.  St. Jean always carried a knife on his person.

At approximately 8 P.M., the defendants and Mathurin took a bus to a vacant house in Hyde Park.  At about 11 P.M., Mathurin

asked Marie Tunis, a resident of an adjacent home, to use her telephone. Mathurin telephoned a pizzeria and placed an order, which included pizzas, chicken wings, and soda, to be delivered. She asked the pizzeria employee if the delivery driver would have change for a one hundred or fifty dollar bill. Mathurin gave St. Jean's cellular telephone (cell phone) number as the call-back number and asked the pizzeria employee to send the delivery driver to the back door of the address to the vacant house. At 11:30 P.M., Gallett asked a passerby on the street to use her cell phone. The passerby testified at trial that Gallett used her cell phone in front of the vacant house. Gallett telephoned the same pizzeria.

Soon thereafter, the victim arrived with the order. Mathurin met the victim in the driveway of the vacant house and escorted him up the rear staircase. Five minutes later, the defendants and Mathurin left the house. Mathurin was holding a pizza box. St. Jean drove Gallett and Mathurin away in the victim's vehicle.

The group abandoned the victim's vehicle in the rear of a church parking lot. The pizzeria sign atop the vehicle had been removed and discarded behind the church. Near or in the victim's vehicle, officers recovered a white pizza box and empty bleach and rubbing alcohol bottles. The label on the outside of the pizza box listed the delivery address as that of the vacant

house and had St. Jean's cell phone number listed as the call-back number.

After abandoning the victim's vehicle, the group returned to Valery's residence.  Upon arriving, the group appeared anxious and smelled of bleach.  St. Jean had a cut on his right hand and was using a bandana to stop the bleeding.  Gallett had blood on his shirt and on the bottom of his sneakers.

After the defendants and Mathurin had left the vacant house, Michael Tunis, who had witnessed the group drive away, investigated the house with his brother and a friend.  Upon entering the home, Tunis discovered blood and chicken wings on the floor near the entryway.  Further into the apartment, in a room off the kitchen, Tunis discovered the victim lying on his back.  The victim had visible puncture wounds and was unresponsive.  Tunis left the house and telephoned police.

At approximately 12 A.M., police arrived at the vacant house.  Inside the residence, police discovered the victim's body along with blood all over the floor; a pizza warmer bag; a bloody chicken wing box; chicken wings; a knife handle; a bloody and slightly bent knife blade; and blood on the door frame leading into the kitchen.  The victim's pants pockets were pulled inside out.

Within two days, a police investigation led to the arrest of the defendants and Mathurin.[3]  At the defendants' trial, redacted inculpatory statements from both defendants were introduced in evidence by way of audio-video recordings.  In addition, a plethora of forensic evidence was introduced that implicated the defendants, including fingerprints and deoxyribonucleic acid (DNA) found at the vacant house, in the victim's car, on the victim, on the pizza boxes, on the defendants' clothing, and on money that Mathurin gave to police after she was arrested.

At trial, Gallett did not deny his involvement in the killing.  Instead, he argued that the evidence of his admissions to police coupled with his age -- eighteen at the time of the murder -- supported a conviction of murder in the second degree rather than murder in the first degree based on deliberate premeditation, extreme atrocity or cruelty, or felony-murder. St. Jean's position was that, although he went with Gallett and Mathurin to the vacant house and broke into it by punching his fist through glass on the back door, he did not participate in the victim's murder or robbery, nor did he share the intent to commit the crimes.

---

[3] Yamiley Mathurin was indicted for murder, but eventually pleaded guilty to manslaughter, armed robbery, and breaking and entering with the intent to commit a felony.

Discussion. 1. Gallett. a. Miranda warnings. Two days after the murder, Gallett was questioned about the crime. During the questioning, Gallett confessed to the killing. A redacted audio-video recording of his interrogation was admitted in evidence at trial. On appeal, Gallett argues that the motion judge erred in denying his motion to suppress. He claims that the Commonwealth failed to demonstrate beyond a reasonable doubt that he voluntarily waived his Miranda rights and voluntarily and knowingly made the inculpatory statements. Gallett contends that he was incapable of voluntarily waiving his Miranda rights because of his age -- eighteen at the time of the murder -- coupled with his low intelligence quotient (IQ). He also contends that his statements were not made voluntarily because the interrogating officers induced his statements by misrepresenting evidence and making false assurances. Finally, he contends that the statements should have been suppressed because police delayed his arrest to prevent him from exercising his right to make a telephone call. The Commonwealth argues that Gallett was not in custody for Miranda purposes during his interrogation. Furthermore, the Commonwealth maintains that even if Gallett were subject to a custodial interrogation, he was advised of and voluntarily waived his Miranda rights and his statements were not induced but made knowingly and voluntarily.

"In reviewing a decision on a motion to suppress, 'we accept the judge's subsidiary findings absent clear error "but conduct an independent review of [the] ultimate findings and conclusions of law."'" Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015), quoting Commonwealth v. Ramos, 470 Mass. 740, 742 (2015). The motion judge found the following. On the evening of September 3, 2010, after police had gathered evidence about the killing of the victim, three officers of the Boston police department were instructed to locate Gallett and Mathurin and ask them to accompany the officers voluntarily to the police station for questioning. Dressed in plain clothes, but with their badges visible, the officers approached Gallett and Mathurin. Detective Aaron Blocker spoke with Gallett, and the two other officers spoke with Mathurin. At the outset, Blocker informed Gallett that he was not under arrest and was free to leave. Blocker asked Gallett to accompany him to the police station to speak with homicide detectives. He told Gallett that Gallett did not have to go with him. Gallett agreed to go to the station, but was concerned about Mathurin, who was crying. Blocker told Gallett that officers would give her a ride.

Gallett rode with two officers in an unmarked police vehicle to the station. He was not handcuffed at any time before or during the interrogation. He arrived at the station

at 8 P.M.  Gallett watched television alone for about one and one-half hours before the interrogation began.

At 9:37 P.M., Detectives Brian Black and Jeremiah Benton began a video-recorded interview with Gallett.  Prior to beginning the interview, Black read Gallett the Miranda warnings.  Black read the warnings one at a time.  Gallett listened to the warnings and then read them himself.  After each warning, he initialed the warning and informed the officers that he understood the warnings.

At first, Gallett denied having any involvement with the killing.  As the interview progressed, Gallett asked Black what was happening with his girlfriend, Mathurin.  Black informed Gallett that she was being charged with murder, armed robbery, and breaking into a house.  Gallett responded, "Let's talk." Gallett proceeded to give a detailed account of his and St. Jean's involvement in the killing and stated that Mathurin just watched.[4]  The interview lasted one and one-half hours, at the end of which Gallett was charged with murder.

The motion judge concluded beyond a reasonable doubt that Gallett was not in custody for Miranda purposes during his interview with the officers at the police station, but that even

---

[4] A redacted audio-video recording of the confession was admitted in evidence at trial.  The transcript of the interrogation was not admitted in evidence.

if he had been, there was no threatening or coercive tactics used by the officers; Gallett made a knowing, intelligent, and voluntary waiver of his Miranda rights; and his statements to police were voluntary.

b.  Voluntariness.  As a preliminary matter, we need not address whether Gallett was in custody at the time he made the inculpatory statements because he ultimately received his Miranda warnings before he made any inculpatory statements. "Because [Gallett] was advised of, and waived, his Miranda rights, the issue becomes whether the Commonwealth has proved, by a totality of the circumstances, that [Gallett] made a voluntary, knowing, and intelligent waiver of his rights, and that his statements were otherwise voluntary." Commonwealth v. LeBeau, 451 Mass. 244, 254-255 (2008).  See Commonwealth v. Medeiros, 395 Mass. 336, 343 (1985) (although voluntariness of Miranda waiver and voluntariness of statement are distinct inquiries, totality of circumstances test under each analysis is same).  In reviewing the totality of the circumstances, we consider factors such as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the

recitation of Miranda warnings."  Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).  "A voluntary statement is one that is 'the product of a "rational intellect" and a "free will," and not induced by physical or psychological coercion.'" Commonwealth v. Monroe, 472 Mass. 461, 468 (2015), quoting Commonwealth v. Tremblay, 460 Mass. 199, 207 (2011).  We conclude that the motion judge's findings and conclusions are supported by the evidence.

i.  Age and IQ.  Gallett contends that his age and relatively low IQ suggest that he did not voluntarily waive the Miranda warnings and voluntarily make inculpatory statements. After reviewing the interrogation video recording and hearing testimony from the interrogating officers, the motion judge found that Black read the Miranda warnings in a calm and careful manner and repeatedly informed Gallett that he could stop answering questions at any time.  Furthermore, the motion judge found that Gallett appeared calm, was responsive to the questions, and displayed well-organized thinking and rational decision-making on how to respond.  The motion judge concluded that Gallett understood the warnings, wanted to appear cooperative, and initially related events that he believed would be helpful to him.

Based on the evidence presented at the hearing on the motion to suppress and our independent review of the recorded

interview, we conclude that the motion judge properly concluded, beyond a reasonable doubt, that Gallett made his statements voluntarily after a knowing and intelligent waiver of his Miranda rights. Gallett was informed of his Miranda rights and indicated verbally and in writing that he understood the warnings. Although his age -- eighteen at the time of the murder -- is a relevant factor to consider, it is not a determinative one. Cf. Monroe, 472 Mass. at 471 (defendant's emotional and physical condition, while not determinative, is substantial factor). Furthermore, Gallett was an average student in high school taking college preparatory classes. While his grades had declined in recent semesters, the motion judge attributed that to lack of attendance. There is no indication that the defendant had cognitive limitations that would affect his waiver and voluntary statements. Regardless, evidence of cognitive limitations "does not compel a determination as matter of law" that the defendant did not "knowingly and willingly waive his Miranda rights and make a voluntary confession." Commonwealth v. Daniels, 366 Mass. 601, 607 (1975).

In addition, there is no indication that Gallett had trouble understanding or answering the detectives' questions during the interview. He was not handcuffed, and the detectives neither yelled at nor acted aggressively toward him.

ii.  <u>Misrepresentation, minimization, and assurances</u>.
Gallett argues that the interrogating officers misrepresented
evidence that strengthened their case and made false assurances
that ultimately induced Gallett into making inculpatory
statements.  We conclude that the officers did not act
impermissibly.

We have suppressed a defendant's statements in
circumstances where police use trickery or a ruse in obtaining a
confession.  Those cases generally have additional circumstances
-- apart from the ruse itself -- that rendered the confession
involuntary.  See, e.g., <u>Monroe</u>, 472 Mass. at 469, 472
(detective's use of minimization and false information, coupled
with coercive tactics relating to defendant's son, rendered
confession involuntary); <u>Commonwealth</u> v. <u>Baye</u>, 462 Mass. 246,
257 (2012) (confession suppressed where police not only
exaggerated strength of evidence against defendant, but also
minimized moral and legal gravity of alleged crime; suggested
that if he did not confess, he would be charged with more
serious crimes; mischaracterized applicable law surrounding
charged crime; and finally, after defendant invoked his right to
counsel, dissuaded defendant from consulting with lawyer);
<u>Commonwealth</u> v. <u>DiGiambattista</u>, 442 Mass. 423, 433-436 (2004)
(confession suppressed where, in addition to presenting
defendant with false evidence suggesting his guilt, police

minimized defendant's alleged criminal behavior and implicitly promised leniency as well as alcohol counselling if defendant confessed). Cf. Commonwealth v. Cartright, 478 Mass. 273, 288 (2017); Commonwealth v. Selby, 420 Mass. 656, 664-665 (1995) (confession admissible where only improper factor was police use of false information in which they pretended to have fingerprints from defendant at scene of crime to secure confession). See also Commonwealth v. Feeney, 84 Mass. App. Ct. 124, 133-135 (2013).

Here, during the interrogation, officers asked Gallett whether video footage from inside the bus that dropped him off in front of the vacant house, his public transit card, or his cell phone records might reveal his location, movements, and telephone calls on the night of the murder.[5] Officers also questioned him about possible forensic evidence that could be found in the victim's stolen vehicle. The officers' tactics were well within permissible parameters and did not rise to the level of "intentional misrepresentation[s] that 'may undermine "the defendant's ability to make a free choice."'" Commonwealth

---

[5] For example, an officer asked Gallett: "[T]here's cameras on there, on buses, right? . . . So when you get off the bus, in theory if cameras are hooked up, I can see you getting off the bus, right?" He also stated: "And then when I pull your phone records, I haven't pulled them fully yet, I suspect maybe I'm going to see a phone call or two that's pinging off a tower right near that house."

v. Spray, 467 Mass. 456, 467-468 (2014), quoting Commonwealth v. Scoggins, 439 Mass. 571, 576 (2003).  Their comments did not impermissibly maximize the apparent strength of their case.  Nor did their questioning impermissibly suggest that they were in possession of incontrovertible evidence against Gallett.

Likewise, the officer's use of minimization and assurances, to the extent they were employed, were not improper.  Gallett contends that the interrogating officers minimized the offense and made assurances by stating:  "You know, maybe there's some reason it happened"; "I sure wouldn't want to be sitting here having me thinking that you planned out a murder when maybe all you were planning out was to get a free meal"; and "It's always better if you have somebody there that can tell you the truth. It has to be the truth as to what happened up there, okay?" These questions and statements were "within the bounds of acceptable interrogation methods."  Cartright, 478 Mass. at 288.

Finally, Gallett suggests that the officers coerced him into believing that his confession would help his girlfriend, Mathurin.  The officers' questioning was as follows:

Gallett:  "What's happening to my girlfriend?"

Officer:  "What do you think is going to happen to your girlfriend?"

Gallett:  "Nothing."

Officer:  "Well I'm going to tell you something.  Something is going to happen to your girlfriend, okay. . . .  [S]he's

> been charged with murder and armed robbery and breaking
> into a house.  I'm going to be very honest about that,
> okay?"

> Gallett:  "Let's talk."

Gallett proceeded to give a detailed account of the murder and stated that Mathurin only watched.  We conclude that while Gallett's confession was close temporally to the time he learned that Mathurin was being charged with murder, the officers' interrogation tactics were not "rife with threats to [Gallett's] ability to maintain contact with [Mathurin]."  Cf. Monroe, 472 Mass. at 469 (police interrogation characterized as psychologically coercive where defendant was threatened with loss of contact with his child).  Nor did the tactics suggest that cooperation with police would result in leniency for Mathurin.  Gallett's will was not overborne, and the tactics did not rise to the level of psychological coercion.  See Commonwealth v. Scott, 430 Mass. 351, 355 (1999) (although "[c]oncern for a loved one may, in certain circumstances, render a confession involuntary," defendant's concern that his sister would face criminal liability for murder not enough to render confession involuntary).  Cf. Monroe, supra (detectives threatened defendant with loss of contact with his child by claiming repeatedly and falsely that if he did not tell them what happened, his child could be taken away and raised by

strangers). The statement by the officer about Mathurin was accurate and made in answer to a question posed by Gallett.

Based on the totality of these circumstances, we see no reason to disturb the judge's conclusion that the Commonwealth established that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights and that his statements were voluntary beyond a reasonable doubt.

iii. Telephone call. Gallett argues that his statements should be suppressed because police purposefully delayed his arrest to prevent him from making a telephone call. We disagree.

An arrested person has a statutory right to make a telephone call. See G. L. c. 276, § 33A. Denying an arrested person the statutory right to make a telephone call only necessitates suppression of evidence when the statute is intentionally violated. See id.; Commonwealth v. Walker, 466 Mass. 268, 278 (2013) (only intentional violation of defendant's right to make telephone call requires suppression of evidence; defendant bears burden of establishing intentional violation). The right to make a telephone call does not accrue when a defendant is brought in for questioning, but when the defendant is formally arrested. Commonwealth v. Hampton, 457 Mass. 152, 159 (2010). Gallett was not arrested until his interview concluded, at which point he was given an opportunity to make a

telephone call.  Police may defer a decision on whether to arrest a defendant for nonnefarious purposes.  See id. at 155. There was no error.

2.  St. Jean.  St. Jean makes several arguments on appeal. First, he contends that the evidence introduced at trial did not support his murder conviction.  Second, he maintains that he was prejudiced by the admission of his and Gallett's redacted police interrogations.  Third, he argues that the judge erred in denying his request for several jury instructions.  Fourth, he contends that the judge improperly invoked juror sympathy when she related a story about a jury's performance during the September 11, 2001, attacks.

a.  Sufficiency of evidence.  St. Jean claims that there was insufficient evidence that he acted as either the principal or joint venturer in the killing and that his motion for a required finding of not guilty should have been allowed.  The Commonwealth contends that there was sufficient evidence to support St. Jean's conviction under a theory of felony-murder, with armed robbery as the predicate felony, and extreme atrocity or cruelty.  "We review the denial of a motion for a required finding of not guilty to determine whether the evidence, viewed in the light most favorable to the Commonwealth, 'was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime[s] charged.'"

Commonwealth v. Gomes, 475 Mass. 775, 781 (2016), quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). We do not "examine the sufficiency of the evidence separately as to principal and joint venture liability." Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009). Instead, we ask "whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." Id.

To warrant a conviction of felony-murder as a joint venturer with armed robbery as the predicate felony, the Commonwealth had to prove that St. Jean was a joint venturer in an armed robbery and that the victim's death occurred in the commission or attempted commission of that armed robbery. Commonwealth v. Rakes, 478 Mass. 22, 33 (2017). To have found St. Jean guilty of the underlying felony of armed robbery, proof was required that St. Jean was part of a venture in which at least one of the coventurers was armed with a dangerous weapon, either applied violence to the victim's body or put the victim in fear, and took the victim's property with the intent to steal it. Id. Absent proof that St. Jean himself was armed, proof that he knew his coventurer to be armed suffices to satisfy the standard. Id.

The evidence was more than sufficient to permit a reasonable jury to find that the defendant committed the murder under a theory of felony-murder. Valery testified that she overheard the defendants and Mathurin planning to rob someone. Valery stated that St. Jean said the group was "looking for a vic." The defendants and Mathurin ordered pizza to be delivered to a vacant house. Mathurin asked if the delivery driver could change a one hundred or fifty dollar bill. St. Jean always carried a knife on his person, and Gallett carried his knife when he left the house. The jury reasonably could infer that St. Jean was armed with a knife; thus, the Commonwealth was not required to prove that St. Jean knew that Gallett was armed.

The victim was lured into the vacant house and stabbed sixteen times. There was evidence of St. Jean's bloody footprints inside the house, and St. Jean had the victim's blood on his jeans. Furthermore, Tunis testified that he saw Mathurin walk the victim to the rear door of the house and then witnessed the defendants and Mathurin leave together. The jury could reasonably infer that St. Jean was inside the house. With St. Jean driving the victim's vehicle, the defendants and Mathurin then fled the scene. The defendants and Mathurin abandoned the vehicle at the rear of a church parking lot. An empty pizza box was discovered near the vehicle. The pizzeria sign that had been atop the vehicle was found discarded behind the church.

Empty bottles of bleach and rubbing alcohol were discovered near or in the victim's vehicle.  Cf. Commonwealth v. Souza, 428 Mass. 478, 490 (1998) (one who manifests indifference whether owner recovers possession may be found to intend to deprive owner of it permanently).  Valery testified that the defendants and Mathurin were nervous and smelled of bleach when she saw them later that night.  Upon discovering the victim's body, police noticed that the victim's pockets were turned inside out.  Reasonable inferences from the evidence showed that St. Jean was armed with a knife, either applied violence to the victim's body or put the victim in fear, and took the victim's property -- the pizza, money, and vehicle -- with the intent to steal it.

Likewise, the evidence was sufficient to support a conviction under a theory of extreme atrocity or cruelty.  To warrant a conviction under this theory, the Commonwealth was required to prove that St. Jean knowingly participated in the killing, that he intended to cause death or grievous bodily harm or engaged in an act a reasonable person would know created a plain and strong likelihood of death, and that the killing was committed with extreme atrocity or cruelty.  Rakes, 478 Mass. at 35.  "The evidence suffices to warrant a finding of extreme atrocity or cruelty if it establishes one or more of the so-

called Cunneen factors."[6]  Id.  See Commonwealth v. Cunneen, 389

Mass. 216, 227 (1983).

Fair inferences from the evidence showed that St. Jean was

armed with a knife, planned to rob someone, lured the victim

into the vacant house, and attacked the victim.  The victim was

stabbed sixteen times.  St. Jean contends that there is no

evidence that he actually stabbed the victim.  To the contrary,

St. Jean always carried a knife and had the victim's blood on

his jeans and his sneakers.  Furthermore, he had multiple cuts

on his right hand.  Although St. Jean's theory at trial was that

he cut his hand by punching a window at the vacant house, St.

Jean told doctors at a subsequent emergency room visit that he

had cut his hand with a pocketknife; told officers during his

interrogation that he was cut with a knife during a fight; and

told his cousin that the injuries to his hands were knife

wounds.  Viewed in the light most favorable to the Commonwealth,

the evidence supports the conviction of murder under a theory of

extreme atrocity or cruelty as well.

---

[6] The Cunneen factors are (1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's injuries; (4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon used; and (7) the disproportion between the means used to cause death and those employed.  Commonwealth v. Rakes, 478 Mass. 22, 35 n.8 (2017).  See Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983).

b.  Admission of statements.  Gallett did not testify, but a redacted audio-video recording of his statements was played for the jury.  A redacted transcript of his interrogation was given to the jury, but only for reference while they watched the recording.  The transcript was collected at the end of the recording and not admitted in evidence.  St. Jean argues that the admission of the redacted audio-video recording of Gallett's interrogation violated his constitutional rights under Bruton v. United States, 391 U.S. 123, 126 (1968), to confront and cross-examine the witnesses against him.  Specifically, St. Jean claims that gaps in the audio-video recording and blank spaces in the transcript directly inculpated St. Jean by inviting the jury to speculate on the identity of the unnamed accomplice. The Commonwealth maintains that the admission of Gallett's redacted statements did not create a Bruton issue because it did not inculpate St. Jean in the crime.  Because St. Jean objected to the admission of his statements at trial, this court will review for error and, if error, whether that error was harmless beyond a reasonable doubt.  Commonwealth v. Bacigalupo, 455 Mass. 485, 495-496 (2009).

"Introduction of a nontestifying codefendant's extrajudicial statement that is 'powerfully incriminating' as to another codefendant violates a defendant's right to confront the witnesses against him under the Sixth Amendment to the United

States Constitution." Commonwealth v. Santos, 463 Mass. 273, 292 (2012), quoting Bruton, 391 U.S. at 135-136. Such "powerfully incriminating" statements include not only direct mention of a named codefendant, but also substitutions such as use of the word "deleted" or some other symbol in place of the codefendant's name, where the jury will realize that the statement obviously refers to and implicates a specific codefendant. See Gray v. Maryland, 523 U.S. 185, 194-197 (1998); Bacigalupo, 455 Mass. at 493-495 (introduction of nontestifying codefendant's statement that his "friend" was present at shooting was sufficiently direct reference to defendant to violate his right to confrontation, notwithstanding limiting instruction). A codefendant's statement that becomes incriminating "'only when linked with evidence introduced later at trial' . . . generally does not offend the Sixth Amendment, so long as an adequate limiting instruction is given" (citation omitted). Commonwealth v. Blake, 428 Mass. 57, 60 (1998).

Here, St. Jean asks us to read between the lines and hold that the gaps in the redacted transcript and audio-video recording directly inculpated him. We conclude that there was no Bruton violation because Gallett's redacted statements did not name expressly, implicate, or obviously refer to St. Jean so as to be "facially" incriminating. See Gray, 523 U.S. at 196-197.

There were three people involved with the killing of the victim -- Gallett, St. Jean, and Mathurin.  Gallett's statements made no express reference to St. Jean as his coventurer, and the blank spaces in the transcript that St. Jean contends were references to St. Jean easily could have been references to Mathurin.  See Commonwealth v. Vasquez, 462 Mass. 827, 843 (2012).  Cf. Bacigalupo, 455 Mass. at 493 (only two people were on trial for shooting that one codefendant said was committed by himself and "friend").  It would not have been obvious to the jury that the blank space was specifically referring to St. Jean.  Cf. id.  Moreover, even if we read in specific pronouns to the transcript, a single pronoun, if not referencing a specific individual, would not raise a Bruton issue in these circumstances.  See Commonwealth v. Wilson, 46 Mass. App. Ct. 292, 294, 298 (1999) (admission of nontestifying codefendant's bare statement that "[w]e stabbed" victim did not violate Bruton by suggesting involvement of one or more other perpetrators).

Although the jury were given a copy of the redacted transcript so that they could follow along with the audio-video recording, the transcripts were collected after the recording was shown and not admitted in evidence.  The judge instructed the jury that the transcripts were not evidence.  Even where pronouns such as "us" and "we" were redacted, the blank spaces that remained were in the transcripts only.  These facts

significantly detract from St. Jean's theory that the jury were able to consider the audio-video recording and the transcript together to form the opinion that the blank spaces in the transcript referred to St. Jean.

Where one defendant gives an account of his and a coventurer's commission of a crime, "it would be a rare case where the process of redaction did not leave behind some peculiar language and awkward transitions." Commonwealth v. Rivera, 464 Mass. 56, 70, cert. denied, 570 U.S. 907 (2013). "The law is clear, however, that inferential incrimination can be properly cured by a limiting instruction . . . ." Id. The judge in this case gave proper limiting instructions on multiple occasions. Prior to the showing of the redacted audio-video recording, the judge instructed that "[c]ertain portions of the statements ha[d] been redacted based on rules of evidence and other applicable laws," and that the jury were "not [to] speculate about the gaps or the reasons for the gaps" and not to "hold the gaps against any party." Despite St. Jean's contention that the "jurors could not be expected, even in the face of a limiting instruction, to ignore the . . . gaps in the statements," the jury are presumed to understand and follow limiting instructions. See Commonwealth v. Martinez, 476 Mass. 186, 194 (2017). The judge's limiting instructions therefore

were sufficient to obviate St. Jean's concern over the gaps. See Blake, 428 Mass. at 59-63.

Gallett's redacted statements incriminate St. Jean only to the extent that the jury accepted the other evidence against St. Jean that places him at the scene of the crime. "This will be the case in virtually any joint trial in which [a codefendant's] statement is admitted." Rivera, 464 Mass. at 71. "The admission of such a statement -- which only implicates the codefendant circumstantially when combined with other evidence in the case -- does not offend Bruton or its progeny." Id. There was no error.

Furthermore, St. Jean argues that the vast scope of the redactions in both his and Gallett's statements created the potential for prejudice by inviting the jury to speculate on the missing portions. We disagree. After a thorough review of the redacted evidence from both Gallett and St. Jean, we conclude that there was no error. In our view, the redactions from the audio-video recordings and transcripts would not lead to confusion or undue speculation. In addition, St. Jean relied on his and Gallett's statements as a critical part of his defense. He maintained that he was at the scene of the crime, but that he did not participate in the victim's murder or robbery or share the intent to commit the crimes. In light of Gallett's confession, St. Jean was able to advance his defense that it was

Gallett who robbed and killed the victim while St. Jean was merely present at the time of the murder. Gallett's redacted confession and St. Jean's own statements supported St. Jean's defense at trial.

St. Jean further benefited from redactions in his own statements that would have contradicted his theory on defense. For example, in his interrogation St. Jean admitted that he took the victim's wallet and car keys. This statement was redacted from the evidence submitted at trial. The statement, if admitted, would have supported the Commonwealth's theory of felony-murder with armed robbery as the predicate. Thus, while there were certain gaps in his interrogation, St. Jean was not hindered by them.

St. Jean also argues that there were two instances where the interrogating officers asked Gallett questions, but the entirety of his response was redacted. St. Jean claims that the officers' questions are not admissible evidence. Although questions asked of a witness are not evidence, the officers' two questions were not accusatory and the redactions that followed were inconsequential.[7] Contrast Commonwealth v. Mejia, 463 Mass. 243, 251 (2012); Commonwealth v. Barbosa, 457 Mass. 773, 799 (2010), cert. denied, 563 U.S. 990 (2011). There was no error.

---

[7] The officers asked: "Where were you?" and "What was supposed to happen?"

c.  Jury instructions.  St. Jean argues that the judge erred in declining to give two jury instructions:  a supplemental instruction for armed robbery, and an instruction on the lesser included offense of use of a motor vehicle without authority.  Because the defendants objected, we review the denial of the requested jury instructions for prejudicial error. See Commonwealth v. Henderson, 434 Mass. 155, 158 (2001).

i.  Supplemental instruction.  St. Jean argues that the judge erred in denying his request for a supplemental jury instruction on armed robbery.  He requested that the judge instruct the jury that they "must find that the required intent to steal coincided with the use of force" to find him guilty of armed robbery and felony-murder.  The judge declined to give the instruction, stating:  "I think it's inappropriate based on the state of [the] evidence [of this case]."

The judge's instructions on felony-murder with armed robbery as the predicate offense, as a whole, sufficiently explained to the jury that the Commonwealth was required to prove the defendant harbored an intent to steal at the same time he used force.  See Commonwealth v. McGee, 467 Mass. 141, 154 (2014) (where jury charge, as whole, adequately covers issue, judge is not required to grant particular instruction). Specifically, the judge instructed the jury that "[t]he actual force and violence must be the cause of the defendant obtaining

possession of the property," and that "the Commonwealth must prove that the defendant took and carried away the property against the alleged victim's will with the intent to deprive the alleged victim of his possessions permanently." These instructions -- located mere lines apart in the transcript -- necessitate that the "force and violence" coincided with the "intent to deprive" the victim of his belongings. Furthermore, the judge's instruction on felony-murder also conveyed to the jury that the Commonwealth must prove "the killing occurred in connection with the felony, and at substantially the same time and place." There was no error.

ii. Lesser included offense. St. Jean further argues that the judge erred in declining to instruct the jury on use of a motor vehicle without authority as a lesser included offense of armed robbery.[8] The Commonwealth argues that use of a motor vehicle without authority is not a lesser included offense of armed robbery in this case because the indictment listed three other stolen items[9] and that the evidence does not provide a rational basis for acquitting the defendant of armed robbery in favor of use of a motor vehicle without authority. The judge

---

[8] In Commonwealth v. Souza, 428 Mass. 478, 494 (1998), we held that, in certain circumstances, use of a motor vehicle without authority is a lesser included offense of armed robbery.

[9] The indictment listed the following items in the conjunctive: "$143.00 U.S. Currency, car, car keys, and food."

declined to give the instruction because she thought it was "highly inappropriate when [there were] four alternative items that are alleged to have been stolen" and that the instruction did not fit with "the facts and circumstances of this case."

"[W]hen the evidence permits a finding of a lesser included offense, a judge must, upon request, instruct the jury on the possibility of conviction of the lesser crime." Commonwealth v. Roberts, 407 Mass. 731, 737 (1990), quoting Commonwealth v. Hobbs, 385 Mass. 863, 871 (1982). Where the evidence provides, however, no "rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense," the lesser included instruction is not necessary (citation omitted). Commonwealth v. Gould, 413 Mass. 707, 715 (1992). "Even when evidence is introduced that would justify conviction for a lesser included offense, the defendant is not entitled to an instruction thereupon unless the proof on the elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense" (quotation and citation omitted). Commonwealth v. Egerton, 396 Mass. 499, 504 (1986). "[A] judge is not required to instruct on a hypothesis that is not supported by the evidence" (citation omitted). Gould, supra.

Here, the evidence did not warrant a finding of the lesser included offense of use of a motor vehicle without authority. The elements differentiating the two crimes were not sufficiently in dispute so that the jury could consistently find the defendant innocent of the greater and guilty of the lesser included offense. See Egerton, 413 Mass. at 715. Specifically, it was not sufficiently in dispute that the defendant intended to deprive the victim of his vehicle permanently. The evidence showed that the defendant drove the vehicle to the back of a church parking lot, removed the pizzeria sign identifying it as a pizza delivery vehicle, emptied it out, cleaned it with bleach and rubbing alcohol, and left it there with a door and two windows open. Cf. Souza, 428 Mass. at 490. Moreover, as the judge noted, the indictment alleged St. Jean took more than just the car. There was evidence that the victim's pockets were turned inside out, cash was taken, and the group was witnessed leaving the vacant house with a pizza box. It would have been inappropriate to give the lesser included instruction where the evidence and circumstances of the case did not support it.

d. Juror sympathy. On the first day of trial, September 11, 2013, the judge began by addressing the jury to acknowledge the anniversary of September 11, 2001. The judge relayed a story from her past experience on the bench. In sum, the judge presided over a trial on September 11, 2001, and was

forced to evacuate the court house.  She told the jury she was moved that the jurors "all voted unanimously to come back the very next day."  She told the current jury, "I just wanted to share that story with you because I'm sure you'll appreciate you're part of the government here, and the government did go on and has continued to go on and you are the government here.  So I wanted to share that story with you and hope you further appreciate your vital role in our justice system here in the Commonwealth of Massachusetts and the United States of America."  On appeal, St. Jean argues that the judge improperly invoked juror sympathy by relaying her story.

The judge's remarks did not prejudice the defendant.  We are mindful that the "effect on the jury of whatever a judge says or does may be significant."  Commonwealth v. Fitzgerald, 380 Mass. 840, 846 (1980).  Here, however, the judge's remarks were made to emphasize the importance of jury duty.  Her reference that the jury were part of the government was cursory and nonprejudicial.  Moreover, "because the judge's remarks were neither intemperate nor critical of the attorneys, there was no danger that the judge exhibited to the jury a bias against the defendant."  See Commonwealth v. Mello, 420 Mass. 375, 392 (1995).  There was no error.

3.  Gallett and St. Jean.  Both defendants raise several issues where our analysis coincides.  First, the defendants

argue that the judge impermissibly limited the cross-examination of two witnesses -- the medical examiner and an interrogating officer.  Second, the defendants claim that the judge erred in denying their request to give a humane practice instruction to the jury.

a.  Cross-examination.  At trial, St. Jean attempted to cross-examine the Commonwealth's medical examiner on wounds on St. Jean's right hand.  Detective Benton testified that St. Jean had cuts on "the meaty side on the back of [his] right hand," "a laceration type injury on the heel near his wrist," and "on the knuckle."  Defense counsel asked the medical examiner, "If a person were wielding a knife and injured themselves on the knife that they were wielding, you would expect to see injuries to the interior of their palm; is that fair to say?"  The Commonwealth objected, and the judge sustained the objection.  At sidebar, defense counsel argued that he should be allowed to question the medical examiner about any defensive or offensive injuries he would expect to see in the circumstances raised in his question.  The judge sustained the objection, concluding that she did not "think this witness [was] qualified to talk about the possible wounds that might be inflicted on knife wielders."

Similarly, Gallett attempted to cross-examine Benton about Gallett's reaction to hearing about Mathurin's arrest during his interrogation.  The Commonwealth objected, and the judge

sustained the objection.  At sidebar, the judge emphasized that the issue of Gallett's change in behavior already had been thoroughly vetted at the motion to suppress stage.

On appeal, the defendants argue that the judge violated their right to confrontation by limiting the cross-examination of the medical examiner and Benton.  The Commonwealth contends that the judge did not abuse her broad discretion by limiting either testimony.

Both the Federal and State Constitutions "guarantee a criminal defendant's right to confront the witnesses against him through cross-examination."  Commonwealth v. Miles, 420 Mass. 67, 71 (1995).  The right is "not absolute," however, and "the scope of cross-examination rests largely in the sound discretion of the trial judge."  Id.  In determining whether a limitation on cross-examination was permissible, "we weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination."  Id. at 72.  We will not overturn the judge's determination unless the defendant can "demonstrate[] that the judge abused [her] discretion and that the defendant was prejudiced thereby."  Id.

In St. Jean's case, the judge should have permitted St. Jean to cross-examine the medical examiner about theoretical wounds on St. Jean's hand.  The medical examiner testified that his duty was to perform postmortem examinations of victims'

bodies. His duties included examinations of individuals who had sustained stab wounds. Given the medical examiner's experience, it would have been reasonable for the medical examiner to opine on potential stab wounds on St. Jean's hands. "A medical expert may testify, in response to a hypothetical question, that the type of injury he has observed is consistent with the Commonwealth's theory of how the wound was inflicted, so long as that theory is based on other evidence already introduced." Commonwealth v. A Juvenile, 365 Mass. 421, 438 (1974). See Commonwealth v. Burke, 339 Mass. 521, 530 (1959).

St. Jean is unable, however, to demonstrate that he was prejudiced by the judge's ruling. First, the judge did not completely bar St. Jean from cross-examining the medical examiner about knife wounds. St. Jean questioned the expert on the position of the attacker based on the victim's wounds, the direction of each stab wound, and the blood loss that would have resulted from such wounds. Second, the judge ruled, over the Commonwealth's objection, that she would allow St. Jean to present expert testimony regarding the cut to his hand if she deemed it relevant after the Commonwealth rested. St. Jean never sought to call such a witness. Third, St. Jean was permitted to present other evidence to show he did not wield the knife, such as his right handedness, the lack of his blood on the knife's handle, and an explanation of the presence of his

blood in other places in the house by suggesting he injured his knuckle by punching a back door window. St. Jean was not prejudiced.

In Gallett's case, the judge did not abuse her discretion in limiting the cross-examination of Benton regarding the voluntariness of Gallett's confession. As the judge noted, the issue previously was vetted by the motion judge. Gallett actively took part in the redactions of his interrogation. The jury viewed a portion of Gallett's police interrogation and followed along with a redacted transcript. The part of the recording that showed Gallett's reaction to hearing about Mathurin and the corresponding lines in the transcript had been redacted. As discussed in more detail infra, any reference to Mathurin was redacted from the recording and transcript because, at the time the redactions were litigated, Mathurin was still a codefendant. It was not logical to allow Gallett to cross-examine Benton on evidence that previously had been redacted from the jury's viewing. The jury would not have had any context to Gallett's line of questioning. Moreover, the judge did not further restrict the entirety of Gallett's cross-examination of Benton. Gallett was able to question Benton about Gallett's cooperation with the officer's investigation, which was consistent with his defense at trial that he was young, cooperative, and remorseful and therefore should be

convicted of murder in the second degree.  It also would have been permissible for Gallett to question Benton about Gallett's demeanor and temperament during the interrogation.

Gallett's reliance on Commonwealth v. Adams, 416 Mass. 55, 60-61 (1993), is misplaced.  In Adams, we held that, although the judge instructed the jury regarding the need to determine the voluntariness of the defendant's inculpatory statements, it was error to exclude testimony from the defendant's mother and a forensic psychiatrist that tended to show that the defendant had been coerced into a confession by the presence of his mother. Id.  As we examined in a later case, the defendant's mental health in Adams was a live issue at trial.  See Commonwealth v. Weaver, 474 Mass. 787, 812-813 (2016), aff'd, 137 S. Ct. 1899 (2017).  Here, "while we regularly admit expert testimony regarding the voluntariness of a statement where the defendant suffers from a mental impairment or mental health issue, there is no evidence that [Gallett] had cognitive limitations or suffers from a mental illness that would affect his capacity to make a voluntary statement."  Id.  Therefore, there was no prejudicial error in limiting the cross-examination of Benton.

b.  Humane practice instruction.  The defendants were interrogated separately in the immediate aftermath of the killing.  Both defendants made statements that implicated themselves in the crime.  Prior to trial, they both filed

motions to suppress their statements, which were denied.  During the motion in limine stage, the defendants participated in redacting the recordings and transcripts of their interrogations.

At trial, the defendants requested a humane practice jury instruction.  The judge found that the defendants chose not to make the voluntariness of their statements a live issue at trial, and thus, the judge declined to give a humane practice instruction.  Gallett's counsel argued that he attempted to cross-examine Benton about Gallett's reaction to hearing that Mathurin was being charged with murder.  For evidentiary reasons, the judge found that Gallett was "clearly . . . prohibited from introducing any evidence about . . . Gallett's alleged reaction when . . . Mathurin's name was mentioned" and that Gallett "adduced no admissible evidence relative to voluntariness."  The judge continued by stating that the line of questioning to Benton was not foreclosed because counsel could have asked him "about [Gallett's] behavior."  She stated that Gallett's counsel "elected not to pursue questions which would have been permissible."  Most notably, the judge concluded that even if Gallett's counsel could argue that Gallett's demeanor did change in order to put into question the voluntariness of his statements,

"[a]ny statements that he made, supposedly when he was thinking about . . . Mathurin, . . . [had] nothing to do with the statements that were actually admitted in this trial.  The ones that were admitted were the ones we saw [in the audio-video recording] and nothing that I saw [in] that [recording] would in any way raise the issue of voluntariness."

St. Jean's counsel took a different approach.  He stated that he "didn't raise [voluntariness] as an issue in the trial . . . [because he] believe[d] that the video [of St. Jean's interrogation] spoke for itself, and [he] didn't need to ask more questions about it."

On appeal, the defendants argue that it was reversible error for the judge to decline to give a humane practice instruction.  We disagree.

We begin with a brief historical account of the origins of the humane practice instruction.  Under the early English common law, confessions were admissible at trial without any restrictions.  Morgan, The Privilege Against Self-Incrimination, 34 Minn. L. Rev. 1, 14-18 (1949).  Even incriminating statements that were obtained by torture were not excluded.  Id. at 18.  For the past 235 years, however, the common-law rule has been that a coerced or involuntary confession may not be admitted in evidence against a defendant at a criminal trial.  2 W.R. LaFave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure § 6.2(a) (4th ed. 2018) (LaFave).  This rule appears to have been first stated in 1783 in the case of The King v.

Warickshall, 168 Eng. Rep. 234 (K.B. 1783).  The Warickshall court stated:

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected."

Id. at 235.  See LaFave, supra.  Undoubtedly, the birth of the English common law regarding confessions came about because the use of physical force was causing defendants to confess to crimes they did not commit.  In 1850, this court held for the first time that under the common law, "[c]onfessions, to be admissible, must be free and voluntary.  They are not considered voluntary, when obtained by any direct or implied promises of favor or benefit, to be gained thereby."  Commonwealth v. Taylor, 5 Cush. 605, 610 (1850).  Then, in 1854, we stated:  "To exclude [a] confession, there must appear to have been held out some fear of personal injury, or hope of personal benefit, of a temporal nature."  Commonwealth v. Morey, 1 Gray 461, 463 (1854).  In Morey, we expressed our concern about the use of a defendant's confession as evidence:  a defendant "may be induced, by the pressure of hope or fear, to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief, or avoid the threatened danger, and

therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted." Id. at 462-463.

The term "humane practice" first appeared in 1885 in Commonwealth v. Preece, 140 Mass. 276, 277 (1885). In Preece, we stated that if a judge determines that a confession is admissible at trial, "the humane practice in this Commonwealth is for the judge . . . to instruct the jury that they may consider all the evidence, and that they should exclude the confession, if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." Id.

Over time, the law in the Commonwealth developed into its current state.[10] Nearly one hundred years after Preece, in Commonwealth v. Tavares, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982), we extended the humane practice rule to apply not only to confessions, but to all incriminating statements

---

[10] We note that prior to its decision in Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court evaluated the admissibility of a suspect's confession under a voluntariness test. See Dickerson v. United States, 530 U.S. 428, 432-433 (2000). "The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy." Id. at 433. "Over time, [the Federal cases] recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." Id.

made by the defendant.  Now, the settled law in the Commonwealth is that "if the voluntariness of the defendant's statements remains a live issue at trial, the judge must submit the issue of voluntariness to the jury."  Commonwealth v. Sunahara, 455 Mass. 832, 834 (2010).  "[T]he judge must instruct the jury that the Commonwealth has the burden of proving beyond a reasonable doubt that the statement was voluntary and that the jurors must disregard the statement unless the Commonwealth has met its burden."  Id. at 835, quoting Tavares, supra at 152.  To be considered a live issue, "substantial evidence of involuntariness [must be] produced."  Commonwealth v. Kirwan, 448 Mass. 304, 318 (2007).  If voluntariness is not a live issue at trial, the judge need not submit the question to the jury. Id.  However, the jury may still consider the voluntariness of a statement in evaluating whether to credit it.  This goes to the jury function of evaluating credibility, not to any role as a gatekeeper of the admissibility of evidence.

Here, because the judge refused to give a humane practice instruction, the only question is whether the voluntariness of the defendants' statements was a live issue at trial to warrant the instruction; put another way, the question is whether "substantial evidence" of involuntariness was produced to warrant a humane practice instruction.  See Kirwan, 448 Mass. at 318.  We conclude that the issue of voluntariness was

insufficiently raised to require the judge to give a humane practice instruction.  See Commonwealth v. Nieves, 429 Mass. 763, 769 (1999).

In Gallett's case, the instruction was not warranted for predominantly two reasons.  First, the focus of Gallett's defense at trial was that, because of his age, intellect, and cooperation with police, he should be convicted of murder in the second degree.  In fact, the focus of Gallett's closing argument was on how his own inculpatory statements warranted a conviction of murder in the second degree.  After discussing Gallett's age and the evidence that he was forthcoming with police, Gallett's counsel stated, "I suggest to you [Gallett's involvement] amounts to murder.  I suggest to you that it doesn't amount to first degree murder."  For the jury to have accepted that the defendant should be convicted of murder in the second degree, they were required to credit his confession.  A humane practice instruction would have contradicted Gallett's theory of defense. See Nieves, 429 Mass. at 769.  Voluntariness is not a live issue at trial where "[t]he defense did not focus on involuntariness." Id.

Second, although Gallett attempted to present evidence regarding the voluntariness of his statements, he did not attempt to present admissible evidence.  As the judge noted, the jury were not privy to the portion of his interrogation

recording that showed his reaction to the news that Mathurin was being charged with murder. That part of the recording was redacted before trial.[11]

Even if the judge should have allowed Gallett to cross-examine Benton about Gallett's reaction to hearing the news about Mathurin, Gallett cannot demonstrate prejudice. Our review of the transcript suggests that references to Mathurin in the audio-video recording were redacted prior to the start of trial -- at a time that Mathurin was still a codefendant -- to avoid Bruton challenges. If the agreed-upon redactions in the recording were reexamined prior to the jury seeing it -- after Mathurin already had accepted a plea offer -- the portion of the recording with references to Mathurin might have been admissible. At that time, the issue whether substantial evidence was produced to question the voluntariness of Gallett's statements would have been a closer one. See Kirwan, 448 Mass. at. 318. Nevertheless, the judge did not completely foreclose questioning Benton about Gallett's demeanor, temperament, or behavior during the interrogation. The judge only foreclosed

---

[11] As stated, at trial, the defendants' video-recorded interviews were admitted in redacted form and played for the jury. Redacted transcripts were also given to the jury during trial, but marked for identification only. The redactions were made prior to trial and in accordance with a ruling by the motion judge denying Gallett's motion for relief from prejudicial joinder.

reference to Mathurin.  The jury were permitted to consider the voluntariness of Gallett's statements in their traditional role as fact finders.  The defendant cannot show prejudice.

Nor did St. Jean produce sufficient evidence to warrant a humane practice instruction.  During the charge conference, St. Jean's counsel admitted that he "didn't raise [voluntariness] as an issue in the trial . . . [because he] believe[d] that the video spoke for itself, and [he] didn't need to ask more questions about it."  Moreover, St. Jean's theory of defense was that although he went with Gallett and Mathurin to the vacant house, and broke into the house by punching his fist through glass on the back door, he did not participate in the victim's murder or robbery, nor did he share the intent to commit the crimes.  This theory aligned with what he told the officers during his interrogation.  St. Jean did not require a humane practice instruction where his argument to the jury was that his interrogation statements were evidence that he was not culpable for the murder.  See Nieves, 429 Mass. at 769.

Conclusion.  For these reasons, we affirm the defendants' convictions.  Furthermore, we have reviewed the record in its entirety and see no basis to grant extraordinary relief under G. L. c. 278, § 33E.

So ordered.